149 P.3d 616 (2006)
1000 FRIENDS OF WASHINGTON, King County, and Center for Environmental Law and Policy, Respondents,
v.
Rodney McFARLAND, Petitioner.
No. 76581-2.
Supreme Court of Washington, En Banc.
Argued January 26, 2006.
Decided December 21, 2006.
*618 Richard M. Stephens, Diana M. Kirchheim, John Maurice Groen, Groen Stephens & Klinge, LLP, Bellevue, WA, for Petitioner.
John T. Zilavy, Futurewise, Seattle, WA, for Respondents.
Laura Beth Wishik, Thomas Aquinas Carr, Seattle City Attorneys Office, Seattle, WA, for Amicus Curiae (Association of Washington Cities).
Timothy Dunning Ford, Office of Attorney General, Olympia, WA, for Amicus Curiae (Attorney General).
Robert D. Johns, Duana Theresa Kolouskova, Johns Monroe Mitsunaga, PLLC, Bellevue, WA, for Amicus Curiae (Master Builders Association of King and Snohomish Counties).
Andrew C. Cook, Building Industry Association of Washington, Olympia WA, Russell Clayton Brooks, Pacific Legal Foundation, Bellevue, WA, for Amicus Curiae (Pacific Legal Foundation).
David Scott Mann, Gendler & Mann LLP, Lauren Rice Burgon, Seattle, WA, Ryan Vancil, Vancil Law Offices, PLLC, Bainbridge Island, WA, for Amicus Curiae (Washington Environmental Council).
Robert Kirk Costello, Alan D. Copsey, Office of Attorney General, Olympia, WA, for Amicus Curiae (Washington State Dept. of Community, Trade & Economic Development).
CHAMBERS, J.
¶ 1 Our state constitution sets forth the blueprint for the structure of our state government. Central to that structure is the sovereignty of the people of the state of Washington because "[a]ll political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights." CONST. art. I, § 1; see also CONST. art. II, § 1; Paget v. Logan, 78 Wash.2d 349, 352, 474 P.2d 247 (1970).
¶ 2 The people of the State are sovereign. Local subdivisions, like King County, are subject to that greater sovereignty and must act within it. But within that constraint, counties and their citizens have considerable latitude to rule and regulate themselves. See CONST. art. II, § 1; Henry v. Thorne, 92 Wash.2d 878, 881, 602 P.2d 354 (1979). This may include the power to revoke county ordinances by referendum. See, e.g., King County Charter (KCC) § 230.40.
¶ 3 When the people of the State require action from a local legislature or executive body, those actions are not subject to a veto via a referendum. Henry, 92 Wash.2d at 881, 602 P.2d 354. This follows from the blueprint, from the very structure of government established by our state constitution. It would violate the constitutional blueprint to allow a subdivision of the State to frustrate the mandates of the people of the State as a whole. Id.; see also Whatcom County v. Brisbane, 125 Wash.2d 345, 884 P.2d 1326 (1994).
¶ 4 The electorate also plays a vital role in checking the exercise of power by elected officials through the initiative and referendum process, both at a State and local level. See, e.g., CONST. art. II, § 1. But the people of the state as a whole are the proper electorate to check the legislative action at issue in these casesby way of a statewide vote on that underlying legislation.
¶ 5 Today, we are asked to decide whether county ordinances enacted under detailed procedures established by the state Growth Management Act (GMA), chapter 36.70A RCW, to designate and protect critical areas are subject to a veto by a local vote. More than a decade ago, this court substantially answered that question. Brisbane, 125 Wash.2d 345, 884 P.2d 1326. There, we concluded that GMA ordinances, at least those relating to critical areas, are not subject to referenda.
¶ 6 We reached that decision on several grounds, including the fact that the county was required by the State to designate and protect critical areas and that the State had established elaborate procedures for public participation that were inconsistent with local up and down votes. The petitioners ask us to revisit and overrule Brisbane. We decline to do so.
*619 ¶ 7 We are sympathetic to the critical importance of local government participation and public participation in land use planning. But it is for the legislature to establish any additional role county voters should play in this process or for the voters of the state to amend the GMA via a statewide process under article II, section 1 of our state constitution. If ordinances adopted pursuant to these state mandates are to be subject to local referenda, the state legislature must include the procedure in the underlying statutory schema. Accordingly we affirm the trial court.

BACKGROUND
¶ 8 Washington State adopted the GMA in 1990. LAWS of 1990, 1st Ex.Sess., ch. 17. Among other things, the GMA requires certain localities to plan their growth, protect the environment, protect the property rights of individuals, and designate and protect "critical areas." RCW 36.70A.020, .060; see also WAC 365-190-040 (setting forth specific procedures). Critical areas include wetlands, areas that recharge aquifers used for potable water, fish and wildlife habitat conservation areas, areas that are frequently flooded, and areas that are geologically hazardous. RCW 36.70A.030(5).
¶ 9 A major component of the GMA is coordinated, countywide planning to further the statutory mandates. The responsibility for that planning falls primarily upon the individual counties that plan under the GMA's directives. RCW 36.70A.040, .070, .210. The legislature has specifically required counties to develop their comprehensive plans according to procedures that require an enormous degree of public participation. RCW 36.70A.172; WAC 365-190-040, 365-195-900 through -925.
¶ 10 Planning is not a one time thing. King County originally adopted its Growth Management Comprehensive Plan in 1994. See King County Dep't of Development & Envtl. Servs., http://www.metrokc.gov/ DDES/gmpc/index.shtm (last visited Dec. 18, 2006). King County is required to review and, if needed, revise its comprehensive plan and implementing ordinances every seven years, most recently by December 1, 2004. RCW 36.70A.130(4)(a). Since King County originally began planning under the GMA, and since it has promulgated its first comprehensive plan, the legislature has added additional substantive requirements, including the explicit direction to use the "best available science" in planning. LAWS of 1995, ch. 347, § 105, codified as RCW 36.70A.172(1).
¶ 11 King County's review process that produced the regulations at issue today took about four years and involved prepublication of proposed regulations, formal public comment, six public meetings, peer review by scientists, republication of proposed regulations with an opportunity for more formal public comment, seven more public meetings, King County Council committee review (including 11 committee meetings), and full King County Council consideration, along with some number of additional public meetings. Clerk's Papers (CP) at 13-60, 63-78, 81-87, 131-34; see also King County Ordinance (KCO) 15051(2)(a) (Statement of Facts).
¶ 12 The regulations at issue today emerged from this process. KCO 15051 explicitly designates and regulates critical areas and amends the zoning code in unincorporated King County. KCO 15052 regulates storm water and KCO 15053 regulates clearing and grading. Together, these ordinances are nearly 400 pages long. The county's statement of facts included in the enacted ordinances reflect its conclusion that KCO 15052 and 15053 are necessary to protect critical areas.[1] If a challenge to the regulations *620 has been timely filed as provided by RCW 36.70A.290, it is not reflected in the very limited record.
¶ 13 One month after these ordinances were enacted, Rodney McFarland initiated the process to hold referenda upon them. An advocacy group, 1000 Friends of Washington, later joined by King County (which has largely taken over the prosecution of this case), filed a declaratory judgment action contending that these ordinances were not subject to referenda. After a contested hearing the trial judge granted summary judgment in favor of the county.[2]
¶ 14 McFarland sought and we granted direct review. The attorney general and the Pacific Legal Foundation filed amici briefs in support of McFarland. The Washington Association of Cities, the Master Builders Association of King and Snohomish Counties, the Washington Environmental Council, and the Washington State Department of Community, Trade, and Economic Development (the state agency responsible for overseeing implementation of the GMA) have filed amici briefs in support of King County.[3]

ANALYSIS

A. BRISBANE

¶ 15 Our review is de novo. Lybbert v. Grant County, 141 Wash.2d 29, 34, 1 P.3d 1124 (2000). When the text of the statute is clear, we need go no further to interpret it. Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wash.2d 1, 11-12, 43 P.3d 4 (2002). However, even when the text is not ambiguous, we will consider all that the legislative body has said on the subject. Id.
¶ 16 Our task today is to determine whether the legislature intended to create broad state policy to be implemented by counties when it enacted the GMA or whether it simply intended to authorize municipalities to take some action. See generally Henry, 92 Wash.2d 878, 602 P.2d 354. How to make this sort of determination has long been a vexing problem. Clear statutory language is often absent, as legislation tends to focus on the substance of the field being legislated upon, and not on how the legislation fits within the larger constitutional structure of government. See generally Philip A. Trautman, Initiative and Referendum in Washington: A Survey, 49 WASH. L.REV. 55, 82-83 (1973). Complicating things, the GMA itself is not a model of consistent clarity. See generally Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 154 Wash.2d 224, 231-33, 110 P.3d 1132 (2005).
¶ 17 We will begin by reviewing the governing principles. We will then turn to whether this court misapplied those principles in Brisbane and whether that case should be overruled. Again, the people of this state are sovereign, and among the essential attributes of their sovereignty is the power to hold statewide referendum on certain legislative acts. CONST. art. I, § 1; art. II, § 1; Paget, 78 Wash.2d at 352, 474 P.2d 247. Many home rule charters also grant this right to county residents. See, e.g., KCC § 230.40; see generally Trautman, supra, at 82-83.
*621 ¶ 18 The sovereignty of the people of individual localities gives way to the people of the State's greater sovereignty, as expressed in the state constitution, through their representatives in the Washington State Legislature, and by the people through statewide legislative acts. See CONST. art. II, § 4; Seattle Bldg. & Constr. Trades Council v. City of Seattle, 94 Wash.2d 740, 747, 750, 620 P.2d 82 (1980) ("While the inhabitants of a municipality may enact legislation governing local affairs, they cannot enact legislation which conflicts with state law."). "`The fundamental proposition which underlies the powers of municipal corporations is the subordination of such bodies to the supremacy of the legislature.'" Id. at 747, 620 P.2d 82 (quoting Philip A. Trautman, Legislative Control of Municipal Corporations in Washington, 38 WASH. L.REV. 743 (1963)).
¶ 19 Within these overarching structural constitutional constraints, localities have considerable power to "`conduct their purely local affairs without supervision by the State, so long as they abide[] by the provisions of the constitution and [do] not run counter to considerations of public policy of broad concern, expressed in general laws.'" Henry, 92 Wash.2d at 881, 602 P.2d 354 (quoting State ex rel. Carroll v. King County, 78 Wash.2d 452, 457-58, 474 P.2d 877 (1970)).
¶ 20 It is long established that when the state legislature directs a county legislative body to take some implementing action, that action is not subject to referenda at the county level, not withstanding what the county charter would otherwise authorize. "A general law enacted by the legislature is superior to, and supersedes, all charter provisions inconsistent therewith. Any charter provision, therefore, which has the effect of limiting or restricting a legislative grant of power to the legislative authority or other officer of a city is invalid." Neils v. City of Seattle, 185 Wash. 269, 276, 53 P.2d 848 (1936) (citations omitted). Put another way, the voters of the county cannot alter a grant of authority to, or the imposition of responsibility onto, the local government by the state legislature.[4]
¶ 21 Thus, when the state legislature instructs a local governmental body to implement state policy, the power and duty is vested in the legislative (or executive entity), not the municipality as a "corporate" entity. Id.; see also State ex rel. Guthrie v. City of Richland, 80 Wash.2d 382, 384, 386, 494 P.2d 990 (1972) (when statute authorized authorities to "proceed forthwith," local referendum would be inconsistent with statutory grant of power). For example, zoning ordinances and regulations are beyond the power of initiative or referendum in Washington because the power and responsibility to implement zoning was given to the legislative bodies of municipalities, not to the municipality as a whole. Lince v. City of Bremerton, 25 Wash.App. 309, 312-13, 607 P.2d 329 (1980) (citing Leonard v. City of Bothell, 87 Wash.2d 847, 854, 557 P.2d 1306 (1976)); see generally J.R. Kemper, Annotation, Adoption of Zoning Ordinance or Amendment Thereto as Subject of Referendum, 72 A.L.R.3d 1030 (2005) (surveying cases). Therefore, initiatives or referenda that attempt to graft limits onto a grant of power by the people of the State, or to modify obligations imposed on local legislative or executive authority by the people of the State, are invalid as in conflict with state law. State ex rel. Haas v. Pomeroy, 50 Wash.2d 23, 25, 308 P.2d 684 (1957) (collecting cases), overruled in part by Earle M. Jorgensen Co. v. Seattle, 99 Wash.2d 861, 665 P.2d 1328 (1983). Courts will exercise their inherent power to keep such matters from the ballot. See, e.g., id. at 25, 308 P.2d 684.
¶ 22 The GMA is a clear example of legislation that creates public policy to be implemented in large part at the local level, by representatives more attuned to the individual needs, wants, and characteristics of their areas. In Snohomish County v. Anderson, 123 Wash.2d 151, 154, 157, 868 P.2d 116 (1994), we found the legislature's intent to create broad state policy to be implemented by local governments clear, thus a proposed *622 referendum on an ordinance adopting procedures to develop a countywide planning policy was barred, in part, because the GMA explicitly instructed the county legislative body to take that action.
¶ 23 Sometimes, the legislative intent is fairly clear, as it was in Anderson. But sometimes, the legislative intent must be gleaned from the statutory schema as a whole. Cf. Campbell & Gwinn, 146 Wash.2d at 11-12, 43 P.3d 4. For example, in Brisbane, 125 Wash.2d 345, 884 P.2d 1326, this court took a broader look at the GMA and concluded that, as a whole, the legislature did not intend county implementation of GMA policies to be subject to referenda, at least in the context of the critical area ordinance presented. The court held:
The purpose of the Growth Management Act, RCW 36.70A, would be frustrated if the people of Whatcom County were permitted by referendum to amend an ordinance adopted to implement the goals of a comprehensive land use plan. Under Anderson, "[p]ermitting the referendum would jeopardize [the] entire state plan [as intended by the Growth Management Act] and thus would extend beyond a matter of local concern." One consequence of such a broad interpretation of the referendum power includes the potential repeal of ordinances required by the Legislature to be enacted for statewide growth management. Also, it would be difficult to balance the various interests contemplated by the Legislature.
Brisbane, 125 Wash.2d at 351, 884 P.2d 1326 (alterations in original) (footnote omitted) (quoting Anderson, 123 Wash.2d at 159, 868 P.2d 116). In reaching the decision that the legislature did not intend to grant the power and duty to implement to the county as a corporate entity, the court relied upon the specific and repeated delegation of power and duty to municipal legislative authorities in the GMA. E.g., RCW 36.70A.040, .130(1)(a); see also generally ch. 36.70 RCW (the Planning Enabling Act, explicitly delegating to the board of county commissioners power to adopt "official controls" on planning, e.g., RCW 36.70.550-.660). We also considered the specific mechanisms of GMA implementation and enforcement and noted that the legislature required municipalities to follow careful procedures (which often take many years) that required extensive notice and opportunity to comment and required the sort of recursive give and take that was inconsistent with up and down votes. Brisbane, 125 Wash.2d at 350-51, 884 P.2d 1326 (citing Anderson, 123 Wash.2d at 156, 868 P.2d 116). Finally, we considered the absence of any mention of referenda in the extensive and detailed provision for public participation and public appeal, and concluded that absence was strong evidence of a legislative desire to vest the power and responsibility in the local legislative authority. Brisbane, 125 Wash.2d at 351-52, 884 P.2d 1326 (citing Anderson, 123 Wash.2d at 157, 868 P.2d 116). There were textual, structural, and policy reasons for our holding that day.
¶ 24 We turn now to McFarland's call to overrule Brisbane. Before it may be overruled, it must be shown to be both incorrect and harmful. State v. Berlin, 133 Wash.2d 541, 547-48, 947 P.2d 700 (1997). We first consider whether Brisbane was incorrect. We conclude it was not.
¶ 25 Again, Brisbane was based on a textual, structural, and policy reading of the entire GMA. See, e.g., Brisbane, 125 Wash.2d at 351, 884 P.2d 1326. McFarland argues, essentially, that this methodology was incorrect and instead, the court should have focused on the individual components of the GMA that most directly applied to the municipality's specific obligations discharged by the ordinance. Under that approach, critical areas ordinances might be subject to referenda because RCW 36.70A.060(2) directs that "[e]ach county and city shall adopt development regulations," rather than saying that "the legislative authority in each county or city" shall adopt development regulations. Since, he contends, the legislature signals that it does not wish ordinances to be subject to referendum by delegating the power to "the legislative authority," Brisbane must be incorrect.
¶ 26 But this laser focus on the words "legislative authority" fails to take into account that all legislation fits within larger *623 legislative and constitutional systems. Even the statute considered in Anderson (a case the challengers quite properly praise) makes it clear that the legislature may use the phrase "legislative authority" and "county" interchangeably. Anderson, 123 Wash.2d at 156-57, 868 P.2d 116 (citing RCW 36.70A.210). The statute at issue in that case said, among other things, "[t]he legislative authority . . . shall adopt a county-wide planning policy [but]. . . . [i]f a county fails for any reason to convene a meeting. . . ." RCW 36.70A.210(2)(c) (emphasis added). Nonetheless, Anderson found that ordinances passed relating to this act were not subject to referenda, and read in the larger context of the law, this holding drew not merely on the words but on the structure established by the statutory system within the greater constitutional one. Anderson, 123 Wash.2d at 156, 868 P.2d 116; accord RCW 36.70A.030(7), .035, .040, .290.
¶ 27 As Professor Trautman noted:
One wonders whether the state legislature in delegating certain powers to local governments is very often thinking of the initiative and referendum when it authorizes the "city council" or the "legislative body" rather than the "city" to do something, or whether the particular choice of words is happenstance. One wonders whether the legislature is not more likely concerned with the subject matter of the particular legislation and the felt need for delegation of authority to the local level without thinking about who at the local level should exercise the power. . . .
If, in reality, the legislature did intend that only the municipal legislative body should have power in a particular instance, that must control. The danger, of course, is that the wording in the statute will be taken at face value and will substitute for reasoning in the particular instance.
Trautman, supra, 49 WASH. L.REV. at 83 (footnotes omitted).
¶ 28 We agree. Reasoning is required. We also note that the phrase "legislative authority" does not have a monolithic meaning in our case law, but rather has long depended on the context and purpose. In State ex rel. Linn v. Superior Court, 20 Wash.2d 138, 155, 146 P.2d 543 (1944), for example, this court held that the "legislative authority" of a county could include the people acting in a legislative capacity and proposing an initiative, and thus the people were bound by the procedures laid down in the state constitution for the "legislative authority" when attempting to amend a municipal charter. Id. Again, the entire statutory schema must be read with care to determine the intent of the legislature.
¶ 29 Furthermore, Anderson, perhaps with Professor Trautman's injunction in mind, seemed to contemplate a case like Brisbane arising. The court went beyond merely reading the statutory language to note, for instance, that "the statute directs the `legislative authority' to convene meetings and establish processes. These responsibilities cannot be performed by the exercise of a `yes/no' vote." Anderson, 123 Wash.2d at 156, 868 P.2d 116. This goes beyond the text of the statute to consider the broader structural implications of a contrary ruling. These structural implications still remain.
¶ 30 Therefore, we disagree that prior to Brisbane, the legislature consistently signaled its intent to create general state policy to be implemented locally by delegating power to "the legislative authority of a county" as opposed to "the county" as a corporate body. Instead, that language is simply one of many tools that this court has used to determine relevant legislative intent.[5]
*624 ¶ 31 Brisbane also accords with other decisions that turned on the structure of the systems established by a statutory schema. In Seattle Building & Construction Trades Council, 94 Wash.2d at 747, 750, 620 P.2d 82, for example, we did not rely on any explicit grant of authority to a local legislative body in determining that the city of Seattle's approval of the final plan for Interstate 90 (I-90) was not subject to a local vote. Instead, the court looked broadly at the statutes and history of the I-90 expansion to conclude that the legislature intended that the city's approval was a matter for the city municipal authorities. See id. at 741-45, 747-50, 620 P.2d 82. Among the many specific reasons articulated by the court for its conclusion was the fact that the legislation provided extensive provision for citizen involvement prior to the final decision making. Id. at 747, 620 P.2d 82.
¶ 32 Similarly, here, the GMA has created extensive provision for citizen involvement. RCW 36.70A.020(11), .035, .140. By way of illustration, the public participation, before these three ordinances were enacted, was extensive. They:
included a mailing to 115,000 unincorporated area residents at the very start of the public review process. . . . 13 public meetings attended by 550 people, Web information resources that received more than 6,000 visits, an e-mail list of nearly 200, mailings to those who provided comments, and a stakeholder group with representatives from such diverse interests as environmental groups, builders and realtors, agriculture, forestry and rural residents . . . . . Hearings were conducted almost weekly and most hearings allowed for an opportunity for public comment. The King County Council also conducted at least five public meetings in rural areas of King County and heard from hundreds of citizens throughout King County.
CP at 272-74 (Decl. of Harry Reinert). Requiring so much public input into the development of the regulations and the comprehensive plans is itself evidence that the legislature intended to leave the ultimate power in the hands of the legislative body. Accord Seattle Bldg. & Constr. Trades Council, 94 Wash.2d at 747-50, 620 P.2d 82.[6]
¶ 33 Furthermore, as noted by the Master Builders in their amicus brief, the current GMA establishes very strict time schedules for challenging ordinances and regulations that a referenda would upset, without any sort of allowance for that possibility. See RCW 36.70A.280.
As a result, property owners and builders have reasonable predictability about the regulations which will govern their land and businesses. Allowing select GMA regulations to be subject to referenda means that property owners will never know at what point they can safely undertake the considerable expense of planning and engineering that is inherent in land development and building processes because they will face the risk that at any time, an interest group of some kind could sponsor an initiative or referendum that would drastically alter their plans.
Amicus Curiae Br. of Master Builders Ass'n of King & Snohomish Counties at 15. This would be inconsistent with the general legislative policy recognized by this court that land use decisions should reach finality quickly. See generally Habitat Watch v. *625 Skagit County, 155 Wash.2d 397, 120 P.3d 56 (2005); James v. Kitsap County, 154 Wash.2d 574, 115 P.3d 286 (2005) (both stressing importance of complying with time limits in the land use context). Additionally, it would put counties at risk of losing eligibility for grants, loans, pledges, or financial guaranties from the State. RCW 36.70A.130.
¶ 34 By both explicit goal and by structure, the GMA seeks coordinated planning. RCW 36.70A.010 (legislative findings), .130(2)(b) (requiring comprehensive plan proposals to be heard by governing body concurrently).[7] This court has already concluded that allowing referenda is structurally inconsistent with this mandate, especially since a referendum in many jurisdictions does not merely act as a veto, but in some counties can strike individual portions of ordinances. See Brisbane, 125 Wash.2d at 347, 884 P.2d 1326 (noting that the referendum sought to eliminate parts of an ordinance); cf. Pierce County Charter §§ 5.60, 5.70; Snohomish County Charter §§ 5.60, 7.80; Whatcom County Charter §§ 5.50, 5.60. That is inconsistent with integrated, comprehensive planning.
¶ 35 Finally, we note that even though reasonable jurists disagreed at the time of Brisbane, legislative acquiescence may also shed light on legislative intent. If the legislature does not register its disapproval of a court opinion, at some point that silence itself is evidence of legislative approval. State v. Coe, 109 Wash.2d 832, 846, 750 P.2d 208 (1988).[8]
¶ 36 Our legislature has had ample opportunity to inform this court that it wishes ordinances implementing responsibilities under the GMA to be subject to referenda. Despite amending the GMA every year since the publication of Brisbane; despite amending the specific portion of the GMA that Brisbane interpreted multiple times since then; and despite the introduction of specific legislation that would have indicated legislative disapproval, it has not elected to do so. See LAWS of 2005, ch. 423, § 6; LAWS of 2002, ch. 154, § 1; LAWS of 2000, ch. 36, § 1; LAWS of 1998, ch. 171, §§ 1, 4; H.B. 1823, 54th Leg., Reg. Sess. (Wash.1995); S.B. 6586, 54th Leg., Reg. Sess. (Wash.1996). This lack of action is at least some evidence that the legislature believes this court accurately divined its intent.
¶ 37 Brisbane was well grounded in law. We note that less than a year after its publication, the author of Anderson, Justice Robert F. Utter, signed Brisbane. The absence of specific "magic words" in every statute relevant to the exercise of authority does not create a presumption that the legislature intended local ordinances passed pursuant to state statutes be subject to local referenda. Instead, we must look to the entirety of the statutory schema established by the legislature. Viewed as a whole, the GMA contemplates that public participation will be channeled through its systems. We decline to overrule Brisbane, and any change to the appropriate procedures governing public participation in GMA ordinances must come from the legislature.

B. APPLYING BRISBANE

¶ 38 While the parties essentially agree that KCO 15051 is not referendable if Brisbane remains (as it does) good law, they *626 are divided on whether KCO 15052 and 15053 fall under it. The proponents of the initiative and two amici believe Brisbane does not apply; the county and the other four amici disagree. The county bears the burden of persuasion because it is the proponent of declaratory relief. E.g., Maleng v. King County Corr. Guild, 150 Wash.2d 325, 334, 76 P.3d 727 (2003).
¶ 39 As amicus Pacific Legal Foundation quite properly notes, if read too broadly, Brisbane could remove all land use regulation from local referendum. Amicus Br. of Pac. Legal Found. at 15. It is not enough that an ordinance is related in some way to the implementation of a comprehensive plan. County ordinances must implement state policy at the direction of the State to be immune from local referenda. In general, those who oppose an election on a referendum will have the burden of showing that the challenged ordinance is necessary to or was passed for the purpose of implementing state policies.
¶ 40 We hold that whether a specific ordinance is subject to a referendum must be decided on a case by case basis, considering, at the least, the scope of the statutory schema undergirding the ordinance, and whether the ordinances were necessary to or passed for the purposes of implementing that statutory scheme. We will show appropriate deference to the expressed intent of the legislative body enacting that ordinance, and if that intent is clear, the challenger must show, by evidence and argument, that in fact the ordinance is outside of the scope of the state statutory schema.[9]
¶ 41 First, we turn to the scope of the statutory schema. McFarland argues that KCO 15052 (regulating surface water flows, especially storm waters) and KCO 15053 (regulating clearing and grading) are outside the scope of the GMA and thus not matters of state policy.
¶ 42 But this is a strained and artificial way to read the county's obligations to protect critical areas. Under the GMA, "[e]ach county . . . shall adopt development regulations that protect critical areas that are required to be designated under RCW 36.70A.170." RCW 36.70A.060(2) (emphasis added).
¶ 43 Critical areas that counties must protect include wetlands, areas critical to recharging aquifers used for potable water, areas used for fish and wildlife habitat conservation, areas that are frequently flooded, and areas that are geologically hazardous. RCW 36.70A.030(5). Clearly, critical areas are particularly sensitive to water flows, which are regulated by KCO 15052 and 15053. The county concluded that it needed to regulate water flows and developed these ordinances as a part of the protection it is providing to critical areas. The county produced considerable evidence to support its conclusion. See, e.g., CP at 269-75 (Decl. of Harry Reinert, detailing process and need for the regulations). We find it has satisfied its burden.
¶ 44 Next, we turn to whether the ordinances were necessary to, or passed for the purposes of, implementing the GMA. We note that the three ordinances were developed together, and that the county's statement of facts appended to KCO 15051 specifically discuss the need for storm water and grading regulations to prevent harm to critical areas, and that KCO 15052 and 15053 have been enacted to accomplish that purpose. KCO 15051(3). The county concluded that to accomplish the mandates of the GMA, it must go beyond merely designating critical areas to protecting critical areas, and that means regulating the actual flow of water in and over the land. See, e.g., RCW 36.70A.172(1) ("In designating and protecting critical areas . . . counties . . . shall include the best available science in developing policies and development regulations to protect the functions and values of critical areas.").
¶ 45 The record amply demonstrates that these three ordinances were developed together for the explicit purpose of protecting critical areas and that the county reasonably *627 believed these ordinances were necessary to implement the purposes of the GMA. See KCO 15051(1)(a) (Statement of Facts); KCO 15051(3) (explaining the interplay of these three ordinances); CP at 269-75 (Decl. of Harry Reinert, detailing process and need for the regulations); accord City of Seattle v. Yes for Seattle, 122 Wash.App. 382, 387, 390, 93 P.3d 176 (2004) (holding that critical areas ordinances are development ordinances beyond the scope of the people's power of referendum), review denied, 153 Wash.2d 1020, 108 P.3d 1228 (2005).[10] We decline the invitation to remand for further fact finding on this point, without prejudice, of course, to any timely substantive challenge to the ordinances under the Administrative Procedure Act (chapter 34.05 RCW) or RCW 36.70A.290 that may be pending.
¶ 46 We accordingly hold that King County has established sufficiently that KCO 15052 and 15053 were passed pursuant to the GMA's requirement that critical areas be designated and protected. RCW 36.70A.040(2); .170 (requiring counties to designate and protect critical areas); .050 (requiring consultation); .060 (establishing procedures); .172 (requiring use of the best available science). Thus, these ordinances implement state policy and are not subject to local referenda.

C. NECESSITY
¶ 47 Petitioners make the related argument that only those ordinances that are actually needed to accomplish the goals of the GMA are exempt from referenda. Since, they assert, the county has not shown that they would be out of compliance with the GMA if they merely re-enacted their prior critical areas ordinances, the new ordinances are not "needed" and may be subject to referenda. Alternately, they ask for remand and an opportunity to show, factually, that the ordinances are not necessary.
¶ 48 This argument stems from the statutory requirement that GMA regulations be regularly reviewed and revised. Again, the GMA provides:
The department [of community, trade, and economic development] shall establish a schedule for counties and cities to take action to review and, if needed, revise their comprehensive plans and development regulations to ensure the plan and regulations comply with the requirements of this chapter. . . . [t]he schedule established by the department shall provide for the reviews and evaluations to be completed as follows:
(a) On or before December 1, 2004, and every seven years thereafter, for . . . King [County].
RCW 36.70A.130(4)(a) (emphasis added).
¶ 49 We turn, as we must, to the statutory schema as a whole. Read in context, RCW 36.70A.130 requires that counties continuously review, evaluate, and revise their comprehensive plans in light of the best available science, the experience of the county with the current regulations, the input of the population, and the ever changing needs and realities of the use of land. We note that since 1994, when King County originally adopted its comprehensive plan, the legislature has required that counties use the best available science in designating and protecting critical areas. RCW 36.70A.172. It has also amended the procedures counties must follow. E.g., RCW 36.70A.040, .060.
¶ 50 Nowhere in these lengthy statutory procedures is a requirement that the county show that it would be out of compliance with the GMA if it simply refused to improve its approach to land management. Instead, a far more reasonable way to read the statutory schema as a whole is that the process creates (hopefully) ever improving management of growth, in light of all of the different legitimate concerns of the stakeholders in the system. Nor do we find any evidence of legislative intent to treat the original comprehensive plan so differently from revised comprehensive plans. Instead, the continual process of revising management of land is itself an integral part of the structure established by the GMA. The legislature has directed that we show considerable deference *628 to county decision making in this area. RCW 36.70A.320(1), (2) (GMA comprehensive plans and development regulations "are presumed valid upon adoption" and places burden on the challenger to show any action taken under the GMA is not in compliance with the requirements of the GMA).[11]
¶ 51 Accordingly, we hold that for the purposes of the referendability of an ordinance, an ordinance is needed if the county reasonably concludes that it furthers the goals of the GMA, and this court will not second guess that holding without some showing that the decision was arbitrary and capricious.
¶ 52 Finally, we turn briefly to the argument that since the power to regulate storm water, grading, and clearing is a police power, regulations governing them are not GMA ordinances. But that overlooks that, for the most part, the GMA did not vest the counties with new power, but instead organized and directed the way power was to be exercised. See generally Richard L. Settle & Charles G. Gavigan, The Growth Management Revolution in Washington: Past, Present, and Future, 16 U. PUGET SOUND L.REV. 867, 974 (1993). Furthermore, it has long been held that ordinances establishing county zoning are not subject to referenda or initiative because the procedure conflicts with the procedures established by statute. See Save Our State Park v. Clallam County Comm'rs, 74 Wash.App. 637, 646, 875 P.2d 673 (1994) (citing cases). The fact that an independent police power exists is not relevant to whether the county was acting pursuant to a statewide policy.[12]
¶ 53 We do not find it relevant that the storm water and grading ordinances regulate land outside of critical areas. Water flows are indifferent to such boundaries.

CONCLUSION
¶ 54 We do not take lightly the concerns expressed by McFarland and his supporting amici regarding the vital importance of the rights of local citizens to participate in policy decisions affecting their communities, and we will take a very hard look at any attempt to limit public participation.
¶ 55 The people of this state, through their legislators, recognized that each local area is unique and placed considerable power and responsibility onto counties to develop comprehensive land use plans according to procedures that required an enormous amount of deliberative public participation. Local exercises of power are often subject to rejection by local referenda. But while the GMA places considerable power and responsibility in local hands, it is still a state power that is being exercised to further state mandates.
¶ 56 The legislature certainly could decide that local ordinances implementing the GMA should be subject to local referendum. But it is for the legislature, not the courts, to amend GMA procedures. Until such an amendment is enacted, we hew to our holding that ordinances such as these are not subject to local referenda.
¶ 57 Accordingly, we affirm the trial judge. Attorney fees are denied. King County's motion to strike McFarland's statement of additional authorities is denied as moot. See Woodward v. Spokane, 51 Wash.App. 900, 908 n. 1, 756 P.2d 156 (1988).
ALEXANDER, C.J., BRIDGE, and OWENS, JJ., concur.
C. JOHNSON, J. (concurring).
¶ 58 The majority reaches the correct result which is compelled by our prior case authority. The majority opinion, when stripped of its unnecessary rhetoric and hyperbole, *629 can be summarized simply: where the state law requires local government to perform specific acts, those local actions are not subject to local referendum.
¶ 59 The Growth Management Act (GMA), chapter 36.70A RCW, is a statewide coordinated effort to, among other things, encourage urban planning and development, reduce sprawl, and protect the environment. RCW 36.70A.020. Under RCW 36.70A.130(1)(a), King County is required to review and, if necessary, revise its comprehensive land use plan and development regulations to ensure compliance with the GMA. Revisions may occur when, upon review, the county finds they are necessary to accomplish the stated goals of the GMA. Here, King County, after an extensive review process, found the challenged ordinances were necessary to protect critical areas. Thus, King County was statutorily required to adopt the ordinances.
¶ 60 In Whatcom County v. Brisbane, 125 Wash.2d 345, 884 P.2d 1326 (1994), we were presented with the question of whether a critical areas ordinance adopted by the Whatcom County Council pursuant to the GMA was subject to amendment by referendum under the county's home rule charter. In holding the ordinance was not subject to referendum, we observed the Act provides for an extensive public participation scheme and notably lacks a referenda provision. Neither the appellant nor amici have shown our holding in Brisbane is incorrect or harmful. Brisbane is directly on point and controls the outcome of this case. The legislature, through the GMA, granted authority to the legislative bodies of the county to enact development regulations such as the ones at issue here. The GMA is a comprehensive act intended to prevent uncoordinated and unplanned growth, as well as protect the environment, on a statewide level. Our holding in Brisbane recognized that permitting local referendum would jeopardize that statewide policy. I therefore concur in the result.
MADSEN, and FAIRHURST, JJ., concur.
MADSEN, J. (concurring).
¶ 61 It cannot be disputed that Washington citizens are concerned with what many see as an erosion of private property rights. At the same time many of these same citizens recognize the value of land use planning. This tension is growing ever stronger as our population increases, bringing demands for increased housing and infrastructure. In the 12 years since this court decided Whatcom County v. Brisbane, 125 Wash.2d 345, 884 P.2d 1326 (1994), the legislature has had many opportunities to amend the Growth Management Act, chapter 36.70A RCW, to allow greater participation by voters on local land use measures. It has declined to do so. As amicus Master Builders Association of King and Snohomish Counties points out, this may reflect the legislature's interest in providing speedy and predictable regulations for land development and building processes. Whatever the reason, the balancing of interests is for the legislature and the legislature apparently agrees with the Brisbane majority that initiative and referendum have no place in that balance. Accordingly, I concur in the result reached by the majority.
FAIRHURST, J., concurs.
J.M. JOHNSON, J. (dissenting).
¶ 62 The King County Council (Council) adopted three controversial ordinances. The three were a "critical areas" ordinance, a clearing and grading ordinance, and a stormwater ordinance, which regulated the use of land only in unincorporated areas of King County. Those ordinances were adopted only by the votes of council members representing incorporated King County; council members representing the affected areas opposed each ordinance.
¶ 63 Appellant Rodney McFarland filed referenda to allow voters to determine the council ordinances at election. Advocacy groups opposed to the referenda filed to enjoin the referenda and were joined by King County, which has taken over the case. The King County Superior Court by order prohibited election on the proposed referenda. A majority of this court now approves this denial of the people's exercise of their right to check legislative power.
¶ 64 The ordinances at issue are each properly subject to referenda, surely two of the *630 three are. The Growth Management Act (GMA), chapter 36.70A RCW, does not require such ordinances nor does that act prohibit these or any referenda. The majority misconstrues the GMA and upholds denial of the right of referendum. Even more disturbing is the majority's apparent disregard of this court's historical presumption in favor of the people's right of referendum. The voice of the people in their own self-government and an important check on legislative power are undermined by the majority's decision today. I therefore dissent.

ANALYSIS
¶ 65 We begin with the first words of article I, section 1 of the Washington Constitution, "All political power is inherent in the people." The constitution was early amended to define two legislative powers retained by the people to enforce this concept: initiative and referenda. As amended in 1912, article II, section 1(b) declares, "The second power reserved by the people is the referendum."
¶ 66 Before this court limits powers constitutionally reserved to the people, we should also be mindful of the Washington Constitution's guiding provision that "[a] frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government." CONST. art. I, § 32.
¶ 67 The fundamental constitutional principle that political power is inherent in the people is illuminated by The Federalist No. 49 (James Madison):
As the people are the only legitimate fountain of power, and it is from them that the constitutional charter, under which the several branches of government hold their power, is derived; it seems strictly consonant to the republican theory, to recur to the same original authority . . . whenever any one of the departments may commit encroachments on the chartered authorities of the others.
Recognition of the people's inherent political authority requires courts to construe law in favor of the people's reserved legislative powers. Referenda allow the people to directly check legislative power. "The people, too, have directly charged us with a duty to be mindful of their sovereign rights." State ex rel. Mullen v. Howell, 107 Wash. 167, 171, 181 P. 920 (1919).
A. Local Ordinances Are Proper Subject of Referenda
1. King County Citizens' Right of Referendum
¶ 68 King County Charter (KCC) section 230.40 (Referendum) should receive the same construction favoring the right of referendum that the Washington Constitution demands for statewide referenda. For a state statute to preempt, the general rule is that there must be a clear statement or expression of legislative intent. Weden v. San Juan County, 135 Wash.2d 678, 695, 958 P.2d 273 (1998); State ex rel. Schillberg v. Everett Dist. Justice Court, 92 Wash.2d 106, 108, 594 P.2d 448 (1979). Thus, prohibition of referenda is found only with a clear statement by the legislature precluding that right.
¶ 69 We apply a liberal construction to preserve the right of referendum. Brower v. State, 137 Wash.2d 44, 58, 969 P.2d 42 (1998). The burden is on the challenger of an initiative proposal to show that the people's power is restricted. Maleng v. King County Corr. Guild, 150 Wash.2d 325, 334, 76 P.3d 727 (2003). The same burden is on a court seeking to block its people's exercise of the right of referendum.
¶ 70 Under the Washington Constitution, no local charter provision may conflict with a provision of the State's constitution or a validly enacted state law. CONST. art. XI, § 4. It is within the state legislature's power to direct "home rule" counties and cities to enact ordinances that are exempt from referenda. Local referenda are prohibited only where a state legislative mandates decision only by the "county legislative authority." But to the extent the legislature demurs to local discretion, it also countenances local referendum.
¶ 71 King County has a home rule charter as authorized by article XI, section 4 of the Washington Constitution. The charter expressly reserves to the county's voters initiative and referendum under section 230.40. *631 Those local initiative and referendum provisions reserve a "fundamental right of a governed people to exercise their inherent right and constitutional political power over governmental affairs." Paget v. Logan, 78 Wash.2d 349, 352, 474 P.2d 247 (1970). These local and statewide initiative rights have also been held to be a "fundamental constitutional right." See, e.g., Save Our State Park v. Hordyk, 71 Wash.App. 84, 90, 856 P.2d 734 (1993) (citing Schrempp v. Munro, 116 Wash.2d 929, 932, 809 P.2d 1381 (1991); Vangor v. Munro, 115 Wash.2d 536, 541, 798 P.2d 1151 (1990); Sudduth v. Chapman, 88 Wash.2d 247, 251, 558 P.2d 806, 559 P.2d 1351 (1977)). KCC section 230.40's right of referendum should therefore receive the same construction favoring the right of referendum found in the Washington Constitution.
2. GMA Does Not Preclude Referenda
a. GMA Mandates Local Control
¶ 72 The rule of construction favoring the right of local referenda is bolstered here by the GMA's insistence upon local decision-making and inclusion of no provision expressly barring referenda or initiative. The emphasis upon local control applies equally to ordinances concerning critical areas.
¶ 73 The GMA's emphasis upon local control is seen in its provisions for comprehensive plans. Each plan was required to include a "land use" element, a "housing element," and a "capital facilities element." RCW 36.70A.070. Zoning ordinances and development regulations were required to be made consistent with the comprehensive plan. RCW 36.70A.040(4). While establishing this general framework for land use planning, the legislature left wide policy making discretion to local jurisdictions. In 1997, the legislature amended RCW 36.70A.320(3) so that the growth management hearings boards must find local enactments in compliance with the GMA unless the action is "clearly erroneous."
¶ 74 Tellingly, state approval of a county's local comprehensive plan is not required. The comprehensive plan and all development regulations are presumed valid upon adoption. RCW 36.70A.320(1). Review occurs only if a timely petition is filed to the board. Even then, a comprehensive plan is still subject to a "clearly erroneous" standard with continuing deference to local decision-making. See RCW 36.70A.320(3).
¶ 75 The GMA merely directs counties to adopt regulations that protect specific types of critical areas. RCW 36.70A.040(3)(b), .060(2). In complying with this general directive, cities and counties are required to "include the best available science in developing policies and development regulations." RCW 36.70A.172(1). But this requirement did not dictate a particular result or policy. In Honesty in Environmental Analysis & Legislation v. Central Puget Sound Growth Management Hearings Board, 96 Wash.App. 522, 531, 979 P.2d 864 (1999), the Court of Appeals noted the board "rejected the idea that the statute required any particular substantial outcome or product. The Board is correct."
¶ 76 Here, the Council adopted a critical areas ordinance pursuant to the GMA that was properly within its local discretion. Referenda are an instrument in local governance. To the extent that the legislature has deferred to local discretion, it has also countenanced the use of the local referendum.
¶ 77 The majority undervalues the constitutional status of initiatives and referenda. Majority at 621-22. These powers may be barred only if expressly precluded by state legislation. Such an exception does not exist here.
b. Referendum Veto Consistent with GMA Procedures
¶ 78 Operating akin to an executive veto, the people's exercise of the right of referendum on GMA-related local ordinances is entirely permissible. Referenda calling for a "yes" or "no" vote on nonmandatory, local ordinances passed pursuant to the GMA are consistent with GMA procedural requirements.
¶ 79 Whereas there are many similarities between initiatives and referenda, important differences are relevant. An initiative involves the drafting and adopting of legislation *632 initiated by voters. It is the people's exercise of legislative power. Initiatives regulating critical areas would not involve the GMA's adoptive procedures.
¶ 80 By contrast, referenda most clearly fit into GMA's process for critical areas ordinances. A referendum, in this context, occurs after the county has presumably complied with its preliminary procedural requirements. Such a referendum is a people's veto. As amicus Washington State Attorney General rightly points out, "[a]s long as the process followed by the legislative authority complies with the GMA, the addition of referenda to approve or reject ordinances does not create a conflict with the GMA." Amicus Br. of Att'y General at 10. If a referendum succeeds, the Council could adopt new regulations consistent with the comprehensive plan and the GMA.
¶ 81 The majority insists that an opportunity for public participation at hearings somehow precludes the right of referendum. Majority at 624. There is no basis for this unusual rationale which would bar any referenda. It violates fundamental principles above-stated to suggest that public involvement may operate as a sub silentio repeal of the people's right of referenda.
¶ 82 The dissent in Whatcom County v. Brisbane, 125 Wash.2d 345, 884 P.2d 1326 (1994) strongly rejected the assertion that "public participation" operates as the equivalent of referenda:
A referendum is not simply an effort to participate in, or contribute to, discussion; rather, the enactment of a referendum measure "is an exercise of the same power of sovereignty as that exercised by the legislature in the passage of a statute". Philip A. Trautman, Initiative and Referendum in Washington: A Survey, 49 Wash. L.Rev. 55, 66 (1973). Initiative and referendum provisions reserve to voters "the fundamental right of a governed people to exercise their inherent and constitutional political power over governmental affairs". Paget, [78 Wash.2d] at 352, 474 P.2d 247. Therefore, to say that public discussion of the proposed content of an ordinance is somehow equivalent to the right to challenge that ordinance by referendum, and that the public must be contented with such discussion, is a mischaracterization of the significance of the referendum power.
Id. at 359, 884 P.2d 1326 (Madsen, J., dissenting). To treat public participation as the equivalent of referenda or to allow hearings to preclude the people's rights was as wrong when Brisbane was decided as it is today.
¶ 83 Furthermore, this court has even affirmed the authority of a non-GMA entity to veto GMA development regulations. In City of Bellevue v. East Bellevue Community Council, 138 Wash.2d 937, 983 P.2d 602 (1999), this court reviewed whether community councils, pursuant to RCW 35.14.040 (not part of the GMA), could continue to exercise a veto authority over development regulations adopted by cities. This court rejected claims that such a veto over GMA zoning regulations was impermissible. East Bellevue Community Council should control here, not Brisbane.
c. Delegation to the "Legislative Authority" Precludes Referenda
¶ 84 The trial court's decision is also erroneous because it disregarded our precedent recognizing the legislature may grant authority exclusively to the local legislative body simply by saying so. Here, for example, the statute could have read: "a county council shall adopt . . . regulations." The majority repeats the trial court's error.
¶ 85 "This court has repeatedly recognized the distinction between a grant of authority by the legislature to a city as a corporate entity and to its legislative and other corporate authorities." State ex rel. Haas v. Pomeroy, 50 Wash.2d 23, 25, 308 P.2d 684 (1957). "[T]he general rule that where a statute vests a power in the city as a corporate entity, it may be exercised by the people through the initiative or referendum process." State ex rel. Guthrie v. Richland, 80 Wash.2d 382, 384, 494 P.2d 990 (1972).
¶ 86 Thus, under our cases (and principles of construction), the specific wording of the statute is crucial to our determination. Here, the statute authorizing and mandating adoption of the critical areas ordinance is *633 RCW 36.70A.060. Subsection (2) specifies that "[e]ach county and city shall adopt development regulations that protect critical areas." Id.
¶ 87 The statute does not refer to "the legislative authority" of each city and county. The language is similar for inclusion of best available science. RCW 36.70A.172(1) ("counties and cities shall include the best available science"). This language does not limit delegated authority to the King County Council. If the legislature intended to preclude local referenda, it could have simply stated this intent. (For example: "referenda shall not be available for such actions.")
¶ 88 In contrast to Brisbane, 125 Wash.2d 345, 884 P.2d 1326 (discussed below), prior court decisions have restricted initiative powers only where power was expressly or exclusively granted to a legislative body. See, e.g., Guthrie, 80 Wash.2d 382, 494 P.2d 990; Lince v. City of Bremerton, 25 Wash.App. 309, 607 P.2d 329 (1980). We should adhere to these prior decisions, not Brisbane.
¶ 89 The majority decries "laser focus" on the words "`legislative authority.'" Majority at 622-23. This is because focus on the actual words of the legislature would permit referenda. Statutory use of the term "legislative authority" in this context would suggest intent to preclude referenda. Those words were not chosen by the legislature. Nothing about the GMA's framework or our constitutional system suggests referenda be precluded.
3. Brisbane Should Be Overruled
¶ 90 To the extent that the right of referendum is inconsistent with Brisbane, 125 Wash.2d 345, 884 P.2d 1326, that case should be overruled. This court's unanimous decision in Snohomish County v. Anderson, 123 Wash.2d 151, 868 P.2d 116 (1994) constituted a more careful and reasonable application of Washington's law regarding statutory construction and the referendum power. In this respect, Brisbane is both harmful and incorrect. The majority now compounds error by following Brisbane instead of distinguishing or overruling it.
a. Brisbane Is Incorrect
¶ 91 The majority in Brisbane was clearly erroneous in concluding the legislature used the terms "county" and "legislative body" interchangeably (and implying the legislature does not know the difference). 125 Wash.2d at 349, 884 P.2d 1326. The only support for the Brisbane majority's conclusion in this regard is a paltry footnote that fails to accurately describe the cited statutory provision. Id. at 350 n. 18, 884 P.2d 1326. The Brisbane majority's footnote "example" of interchangeable use of terms actually shows the legislature is aware of the distinction between the term "county" and the specific term "county legislative body." Our cases also require us to assume the legislature knows the difference, and chooses its language.
¶ 92 The Brisbane majority's footnote quotes only RCW 36.70A.040(3), concerning adoption of comprehensive land use plans. 125 Wash.2d at 350 n. 18, 884 P.2d 1326. In that quotation is a reference to subsection (2) and the "date the county legislative body takes action as required by subsection (2)." Id. The footnote fails to mention that subsection (2) deals only with counties that are not automatically required to plan under the GMA but that nevertheless choose to opt in and become GMA counties. Subsection (2) states:
The county legislative authority of any county that does not meet . . . [the] criteria established under subsection (1) of this section may adopt a resolution indicating its intention to have subsection (1) of this section apply to the county.
RCW 36.70A.040 (emphasis added). The legislature was clear that only the "legislative authority," through adoption of "a resolution" may decide for a county to opt in to GMA requirements. In subsection (3), the legislature further stated the action undertaken in subsection (2) must be by the "legislative authority" and not by the county generally.
¶ 93 By assuming the legislature was merely careless in its use of the terms "county" and "legislative body," the Brisbane majority denigrates the legislature. Careful reading of the statute, as is this court's duty, undermines the Brisbane majority's opinion.
*634 ¶ 94 Moreover, instead of following Anderson and looking at the specific wording of the statute at issue to determine whether referendum rights existed, the Brisbane majority looked at the wording of the other provisions in the GMA. See Brisbane, 125 Wash.2d at 350 n. 18, 884 P.2d 1326. There is no precedent supporting the Brisbane majority. Anderson was limited to reviewing the specific statutory provision delegating the authority to adopt the ordinance at issue in that case (RCW 36.70A.210). Anderson held RCW 36.70A.210(2) was "[a]t the heart" of determining whether referendum rights were available and did not even discuss or review other sections of the GMA. Anderson, 123 Wash.2d at 155, 868 P.2d 116. Contrary to the Brisbane majority, the focus should not be on mere presence of both words in a statutory provision, but what term is specifically used when the legislature delegates power under the GMA.
¶ 95 Finally, the majority in Brisbane gave no recognition of the presumption favoring the right of referendum. This disregard of citizens' right to referenda is clearly erroneous. As discussed below, it is also harmful.
b. Brisbane Is Harmful
¶ 96 Brisbane is harmful because it wrongly denies citizens fundamental rights. Rights of initiative and referenda are the "first of all the sovereign rights of the citizen the right to speak ultimately and finally in matters of political concern." Howell, 107 Wash. at 171, 181 P. 920. Laws that limit this fundamental right should be strictly construed. However, Brisbane runs contrary to our constitution's rule favoring initiative and referenda in the absence of a clear legislative repeal.
¶ 97 Brisbane is also harmful because of the problems it creates for the drafting of legislation. Until Brisbane, there was no question that the legislature might prohibit local referenda by delegating authority to the "legislative authority." What Anderson clearly reiterated, Brisbane unfortunately muddled. The majority's expansive reading of Brisbane puts the legislature in the position of having to include a provision in every bill affecting local government as to whether referenda should be allowed. The majority's assumption is that the people are not assumed to have such rights. But referenda exist as the people's check upon unconstitutional or abusive legislation. See Howell, 107 Wash. at 172, 181 P. 920 ("the referendum was asserted . . . because the people . . . had become impressed with a profound conviction that the legislature had ceased to be responsive to the popular will."). The legislative branch has incentive to avoid referenda. The majority's adherence to Brisbane interferes with this important check-and-balance on abuse of government power.
¶ 98 Overruling Brisbane would also bring consistency with this court's decisions in Anderson and East Bellevue Community Council.
B. Noncritical Areas Ordinances Are Subject to Referenda, Even Under Brisbane
¶ 99 Even if Brisbane were correct, that case should not completely control here. Brisbane related to critical areas ordinances. Clearing and grading or stormwater ordinances are not critical areas ordinances under the GMA. A county's power to enact and amend the latter ordinances exists independent of the GMA. Such regulations derive from a county's police power, granted by article XI, section 11 of the Washington Constitution. See Rhod-A-Zalea & 35th, Inc. v. Snohomish County, 136 Wash.2d 1, 14, 959 P.2d 1024 (1998) (grading ordinances enacted under the police power); Phillips v. King County, 87 Wash.App. 468, 488, 943 P.2d 306 (1997), aff'd in part, 136 Wash.2d 946, 968 P.2d 871 (1998) (stormwater ordinances enacted under police power). Chapter 36.70A RCW contains no reference to clearing and grading ordinances or to stormwater ordinances. They are not mandated by the GMA. Thus, the referenda challenging these ordinances were improperly blocked.
¶ 100 Not all land use regulations are the result of a GMA mandate. In Skagit Surveyors & Engineers, LLC v. Friends of Skagit County, 135 Wash.2d 542, 566, 958 P.2d 962 (1998), this court held the growth management hearings boards had no authority to invalidate development regulations which were not adopted under dictates of the GMA.
*635 ¶ 101 There is nothing in the GMA indicating the counties' preexisting authority to enact clearing and grading ordinances or stormwater ordinances was superseded. Our courts have recognized that referenda apply to grading ordinances. See, e.g., Postema v. Snohomish County, 73 Wash.App. 465, 468, 869 P.2d 1107 (1994). Even the growth management hearings board has deemed the ordinances at issue in this case as "general regulation for rural lands, not a designation or regulation of critical areas." Keesling v. King County, No. 05-3-0001, Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Final Dec. and Order (Wash. July 5, 2005) at 31 (emphasis omitted).
¶ 102 As articulated by the attorney general amicus, a more reasonable interpretation of Brisbane is that the GMA requires an analysis of whether the authority to adopt each development regulation is exclusively vested in the county council. Amicus Br. of Att'y General at 11. Under RCW 36.70A.030(7)'s definition of "development regulation," both the grading and clearing ordinance and the stormwater ordinance at issue here are development regulations.
¶ 103 Development regulations are unlike any in Brisbane because here there is not even a contention of interchangeable use of county authority and legislative authority. The statute specifies a county or city only as the corporate body. Absent a specific vesting of power in the legislative authority to adopt a grading and clearing or stormwater ordinances, referenda on such ordinances do not conflict with a reasonable interpretation of Brisbane.
¶ 104 Even if the Council proclaimed the clearing and grading and stormwater ordinances to be GMA measures, that should not determine this court's decision. Our law has a presumption in favor of the constitutional right of referendum. Moreover, our system of checks and balances requires the judiciary to safeguard referenda from intrusion by legislative bodies. After all, the purpose of the referendum power is "to slay unwanted legislation." Wash. State Farm Bureau Fed'n v. Reed, 154 Wash.2d 668, 683, 115 P.3d 301 (2005) (Chambers, J., dissenting). The right of referendum would be too easily frustrated were a local legislative body given the ability conclusively to determine whether a particular land use regulation was enacted pursuant to GMA mandate and thus exempt from the local referendum.
¶ 105 To permit a local legislative body of representatives to decide for itself whether its ordinances shall be subject to local referendum,
would be to affirm that the deputy is greater than his principal; that the servant is above his master; that the representatives of the people are superior to the people themselves; that men acting by virtue of powers may do not only what their powers do not authorize, but what they forbid.
The Federalist No. 78 (Alexander Hamilton). It is untenable to assume the legislature through GMA would sub silentio effect the radical change in local land use regulation as King County suggests. The GMA was promulgated in the context of preexisting state police powers entrusted to local government for purposes of purely local land use regulation. Our law's presumption favoring the right of referendum and the importance of checks and balances makes the majority's conclusion all the more disconcerting.

CONCLUSION
¶ 106 The ordinances at issue are each subject to the people's exercise of their right of referendum. This power is also express in the King County Charter and was not repealed by the legislature. In upholding the superior court's judgment preventing an election on these proposed referenda, the majority of this court has used a strained reading of the GMA and the King County Charter to deny these rights. The majority undermines our constitutional presumption favoring the people's right of referendum. I dissent.
SANDERS, J., concurs.
NOTES
[1] The ordinance itself explains the relationship between the critical area ordinances and "other regulations, projects and programs":

a. King County uses a combination of regulatory and nonregulatory approaches to protect the functions and values of critical areas. Regulatory approaches include low-density zoning in significantly environmentally constrained areas, limits on total impervious surface, stormwater controls and clearing and grading regulations.
. . . .
c. The standards in this critical areas ordinance for protection of wetlands, aquatic areas and wildlife areas work in tandem with landscape-level standards for stormwater management, water quality and clearing and grading;
. . . .
e. The stormwater ordinance (Ordinance 15052) being adopted in conjunction with this critical areas ordinance. . . . places a strong emphasis on flow control best management practices that disperse and infiltrate runoff on-site. . . .
f. The clearing and grading ordinance (Ordinance 15053) being adopted in conjunction with this critical areas ordinance applies seasonal clearing limits throughout unincorporated King County to help prevent sedimentation of streams and other aquatic areas. . . . Retention of forest cover helps to preserve the ability of soils and forest cover to capture and slowly release or infiltrate rainwater [and] augments the protection provided by buffers for wetlands, aquatic areas, and fish and wildlife conservation areas.
KCO 15051(3).
[2] The transcript of this hearing came to the court stamped "sealed." After our opinion was released, the trial judge informed us that the transcript had been improperly marked. It is not sealed.
[3] Perhaps because this is not an Administrative Procedure Act (chapter 34.05 RCW) challenge to the substance of the regulations, but instead a question of whether the regulations are properly subject to local referenda, the court has not been provided with the administrative record. Our recitation of the facts is taken from the record provided, which we recognize is incomplete. Nothing in this opinion should be taken to prejudge any substantive claim either way.
[4] Additionally, administrative ordinances are not legislative acts and thus are not subject to the people's legislative power of referendum and initiative. See generally Leonard v. City of Bothell, 87 Wash.2d 847, 850, 557 P.2d 1306 (1976); see also Bidwell v. City of Bellevue, 65 Wash.App. 43, 827 P.2d 339 (1992). Neither party argues that these ordinances are administrative.
[5] We note in passing that City of Bellevue v. East Bellevue Community Council, 138 Wash.2d 937, 983 P.2d 602 (1999), is not inconsistent with our holding in Brisbane. East Bellevue merely affirmed that when a state statute gives a community council a veto over a rezone, that community council has that power. Id. at 945, 983 P.2d 602. The City of Bellevue had argued that the use of the community council veto brought the city out of compliance with the GMA because the city's actual zoning no longer mirrored the zoning provided for in its comprehensive plan, as required by the GMA. This did not invalidate the statutory power of the community council, especially since all that the city had to do to bring its comprehensive plan into accord with the GMA was to amend it to recognize the veto. Id. at 947, 983 P.2d 602. East Bellevue merely harmonized statutory grants of power and responsibility with one another; it does not stand for the broader proposition that GMA ordinances are subject to referenda.
[6] We respectfully disagree with the dissent that considering the implication of these provisions means the court today "approves [the] denial of the people's exercise of their right to check legislative power," dissent at 629, or that this court holds that the "opportunity for public participation at hearings somehow precludes the right of referendum." Dissent at 632. In case others are similarly misled, we disavow the dissent's interpretation. The dissent, we fear, confuses the power reserved to the people of the State in article I, section 1, and article II, section 1(b), and the powers and duties of local governing bodies. All branches of government operate within the rule of law, including the decades of case law announced by this court. That case law was succinctly summarized by Justice Charles Johnson's concurrence. "[W]here the state law requires local government to perform specific acts, those local actions are not subject to local referendum." Concurrence at 629. Our role is to interpret the law within the rule of law regardless of our personal feelings on the wisdom of the law in question.
[7] The Association of Washington Cities contends that frequently different regulations will all play a role in a comprehensive plan, and the repeal of one could bring the municipality out of compliance with the GMA and result in unforeseen effects, such as full scale factories in suburban neighborhoods. See Amicus Curiae Br. of Ass'n of Wash. Cities at 8-10. While this takes us out of the questions presented, the downstream consequences the cities point to do seem to be inconsistent with the stated goals of the GMA.
[8] There has been a question raised as to whether we abandoned or limited the canon of legislative acquiescence in Skagit Surveyors & Engineers, LLC v. Friends of Skagit County, 135 Wash.2d 542, 958 P.2d 962 (1998). We did not. The question in Skagit Surveyors was whether a growth management hearings board (GMHB) had the power to invalidate zoning ordinances enacted prior to the effective date of the GMA. The GMHB split on the subject, and this court ultimately held that the boards did not have such power. Skagit Surveyors considered the role of legislative acquiescence in the context of administrative tribunals, and we merely held that when administrative tribunals are split on a point of law, the legislature is not deemed to have acquiesced to any one of them. Id. at 566, 958 P.2d 962.
[9] We note in passing that the overbreadth, if any, of the ordinance beyond the scope of the statutory schema might also, in the proper case, bear on this analysis. But in the absence of facts tending to show that the ordinances are overbroad, the question is not properly before us today.
[10] The supporters of the referenda attempt to distinguish Yes for Seattle on the grounds that Yes for Seattle involved an initiative, not a referendum. We have long rejected attempts to make such distinctions. See, e.g., Guthrie, 80 Wash.2d at 384, 387, 494 P.2d 990.
[11] Cf. RCW 36.70A.3201:

Local comprehensive plans and development regulations require counties and cities to balance priorities and options for action in full consideration of local circumstances. The legislature finds that while this chapter requires local planning to take place within a framework of state goals and requirements, the ultimate burden and responsibility for planning, harmonizing the planning goals of this chapter, and implementing a county's or city's future rests with that community.
[12] We elect to not reach the remaining contentions as they are not supported by relevant citation to authority. See In re Registration of Elec. Lightwave, Inc., 123 Wash.2d 530, 545, 869 P.2d 1045 (1994) (citing State v. Lord, 117 Wash.2d 829, 822 P.2d 177 (1991)).