

**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE ___OCT 2 4 2013___

_Madsen, C.J.___
CHIEF JUSTICE



This opinion was filed for record
at ___9:00 a.m.___ on ___October 24, 2013___

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CEDAR RIVER WATER AND SEWER DISTRICT and SOOS CREEK WATER AND SEWER DISTRICT, | ) ) ) ) | No. 86293-1 |
| Appellants, | ) ) ) | |
| v. | ) ) ) | En Banc |
| KING COUNTY; SNOHOMISH COUNTY; ALDERWOOD WATER AND WASTEWATER DISTRICT; CITY OF ALGONA; CITY OF AUBURN; CITY OF BELLEVUE; CITY OF BLACK DIAMOND; CITY OF BOTHELL; CITY OF BRIER; CITY OF CARNATION; COAL CREEK UTILITY DISTRICT; CROSS VALLEY WATER DISTRICT; HIGHLANDS SEWER DISTRICT; CITY OF ISSAQUAH; CITY OF KENT; CITY OF KIRKLAND; CITY OF LAKE FOREST PARK; LAKEHAVEN UTILITY DISTRICT; CITY OF MERCER ISLAND; NORTHEAST SAMMAMISH SEWER DISTRICT; NORTHSHORE UTILITY DISTRICT; OLYMPIC VIEW WATER AND SEWER DISTRICT; CITY OF PACIFIC; CITY OF REDMOND; CITY OF RENTON; RONALD WASTEWATER DISTRICT; SAMMAMISH PLATEAU WATER AND SEWER DISTRICT; CITY OF SEATTLE; SKYWAY WATER AND SEWER DISTRICT; CITY OF TUKWILA; VALLEY VIEW SEWER DISTRICT; VASHON SEWER DISTRICT; WOODINVILLE WATER DISTRICT; SHOREWOOD HEIGHTS APTS., LLC, as successor in interest to Bayshore | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Filed ___OCT 2 4 2013___ |

Shorewood G.P., Inc.; and the STATE OF ）
WASHINGTON, acting by and through the ）
Washington State Parks and Recreation ）
Commission, ）
 ）
      Respondents, ）
 ）
      and ）
 ）
MUCKLESHOOT INDIAN TRIBE, ）
 ）
      Defendant. ）
———————————————————————）

GONZÁLEZ, J.—Ten years ago, King County urgently needed a new facility to treat sewage because existing treatment plants were near capacity. Procuring a location for a new sewage treatment plant was very difficult. After many years of negotiation and seven separate lawsuits, Snohomish County agreed to let King County build the Brightwater sewage treatment plant in south Snohomish County. As part of the settlement, King County agreed to provide a substantial mitigation package for the local Snohomish County community near Brightwater. The cost of the mitigation was included in the capital cost of the plant. Capital funding for the plant came mostly from the sale of bonds that were primarily secured by sewage treatment fees and capacity charges imposed on new sewage hookups. Two local utility districts that contract with King County for sewage treatment filed this suit arguing that the mitigation package was excessive, among many other claims. The trial judge largely rejected the districts' claims. We largely affirm.

FACTS

In 1957, the Washington legislature authorized "cities and counties to act jointly" to meet certain "common problems in order that the proper growth and development of the metropolitan areas of the state may be assured." LAWS OF 1957, ch. 213, § 1, *currently codified in* ch. 35.58 RCW. Among other things, the legislature was concerned that population growth "created problems of sewage and . . . water supply," especially relating to Lake Washington. *Id.* The next year, King County voters in the areas surrounding Lake Washington approved the creation of the metropolitan municipal corporation known as "Metro." *Mun. of Metro. Seattle v. City of Seattle*, 57 Wn.2d 446, 449, 357 P.2d 863 (1960) (*Metro*). Metro was established "for the stated purpose of 'metropolitan sewage disposal' . . . to address local pollution issues and to enhance water quality in the area's fresh and salt water bodies." Clerk's Papers (CP) at 18663. By April 1959, Metro had adopted a comprehensive regional sewage disposal plan under which the existing municipalities would continue to collect sewage to be processed and disposed of by Metro for a fee. *Metro*, 57 Wn.2d at 449. Almost from the beginning, the proper scope and cost of sewage treatment has been the subject of conflict and litigation. *See id.* at 450, 453.

In 1974, the legislature amended and expanded chapter 35.58 RCW. LAWS OF 1974, Ex. Sess., ch. 70. Among other things, statutory references to "sewage disposal" were frequently changed to the more general "water pollution abatement." *Id.* Even before that, Metro had performed many different water quality improvement

3

projects, some not directly related to sewage disposal. These programs were not without controversy, and in 1988, "Metro formed a special task force, the 'Water Quality Program Review Committee,' to review Metro's responsibilities, authority, programs and funding relating to water quality." CP at 18663. A.J. Culver, then the mayor of the city of Issaquah, chaired the committee, and the task force's report is commonly referred to as the "'Culver Report.'" *Id.* "The Culver Report noted that Metro historically had spent about 3.5 percent of its operating funds in areas which arguably were 'not absolutely required in order to achieve a regulatory requirement and/or fulfill component agency agreements'" but that "these expenditures directly benefited Metro." CP at 18663-64. It "recommended that Metro continue to fund water quality programs including those not directly related to sewage treatment," subject to a budget cap. CP at 18664. "This funding source for such expenditures became known as 'the Culver Fund'" and, with some modification, exists today. CP at 18664-65.

In 1992, King County absorbed Metro. Now, King County has the power to dispose of sewage, abate water pollution, remove storm water, and improve water quality. RCW 35.58.200. King County executes these activities through its Wastewater Treatment Division, which, the trial court found, is operated as a proprietary utility. CP at 18662.

The plaintiffs, Cedar River Water and Sewer District and Soos Creek Water and Sewer District, are two of 34 entities that contract with King County for sewage treatment in return for an annual fee. These sewage treatment fees are paid into a "Water Quality Fund," though it appears these fees are not the fund's only source of revenue.[1] CP at 18668. Up to 1.5% of this fund is transferred annually to King County's Water and Land Resources Division for Culver Fund projects. The division and the county council decide which specific projects will be funded by the Culver Funds. Projects have ranged from an education program aimed at preventing people from flushing pharmaceuticals down their toilets to daylighting the Ravenna Creek and removing its waters from the treatment stream.

Many entities oversee and advise King County on how to manage its water and sewage problems and resources. Most relevantly, King County sewage utilities, including the plaintiffs, "are members of the Metropolitan Water Pollution Abatement Advisory Committee . . . an advisory body created under RCW 35.58.210. [Its] function is to 'advise the metropolitan council in matters relating to the performance of water pollution abatement function.'" CP at 18664. This advisory council has recommended eliminating the Culver Fund several times, which King County has "categorically rejected." CP at 18664-65.

---

[1]Judge Felnagle noted in his findings of fact that the Water Quality Fund is "comprised largely of sewage treatment revenues" but did not explicitly identify the other funding sources. CP at 18668. The record before us does not contain a clear description of the various funds, their funding sources, or the relations between the funds.

Meanwhile, by the 1990s, King County was operating two regional and several smaller sewage treatment plants. The county projected that its treatment plants would be at maximum capacity by about 2010. The county spent eight years developing a Regional Wastewater Services Plan in collaboration with "a wide range of stakeholders" and concluded a new plant should be built in either north King County or south Snohomish County. CP at 5407. By 2001, the State Department of Ecology had approved King County's wastewater service plan, including the construction of a new plant, now called Brightwater.

In 2003, after "literally hundreds of meetings in Snohomish County and King County," King County selected 114 acres in South Snohomish County for the treatment plant and issued an Environmental Impact Statement. CP at 5412, 1935. In apparent response, Snohomish County passed an ordinance that required any entity seeking to build an essential public facility, which includes sewage treatment plants, to obtain a conditional use permit that showed the plant would be compatible with surrounding land uses.[2] King County challenged this ordinance under the Growth

---

[2] "Essential public facilities" is defined in the Growth Management Act.

> Essential public facilities include those facilities that are typically difficult to site, such as airports, state education facilities and state or regional transportation facilities as defined in RCW 47.06.140, regional transit authority facilities as defined in RCW 81.112.020, state and local correctional facilities, solid waste handling facilities, and inpatient facilities including substance abuse facilities, mental health facilities, group homes, and secure community transition facilities as defined in RCW 71.09.020.

RCW 36.70A.200(1). Neither party disputes the characterization of sewage treatment plants as "essential public facilities." *Cf.* WAC 365-196-200(8) (definition), -550 (establishing criteria).

Management Act, chapter 36.70A RCW, beginning a series of seven lawsuits between the counties relating to Brightwater.

At around the same time, from 2002-2004, King County was negotiating with StockPot Soups, a subsidiary of the Campbell Soup Company, which operated a manufacturing facility located in the original footprint of the Brightwater site. Ultimately, Brightwater did not include the StockPot site, but StockPot was very concerned that proximity to a sewage treatment plant "would cause significant adverse impacts to its business." CP at 18672. Among other things, StockPot appealed the county's final environmental impact statement, contending it paid insufficient attention to the adverse effects the plant would have on its business. As part of the settlement of that suit, King County agreed to pay StockPot relocation costs, re-establishment expenses, and an additional $2 million for local job retention if StockPot stayed in the area and met listed conditions.

By 2005, Ecology had become "very concerned that if Brightwater is not constructed and brought into operation in a timely manner, the existing regional wastewater facilities will be overburdened. The likely result will be permit violations and degraded water quality in Puget Sound." CP at 5442. Ecology threatened to impose a moratorium on new sewer connections and construction in King and Snohomish Counties if one were not built. Previous delays in expanding treatment capacity had led to $1,000 per-day fines from Ecology.

King and Snohomish Counties began negotiating at the highest levels. These negotiations resulted in a global settlement agreement that settled the remaining lawsuits and in a development agreement for the Brightwater plant. The settlement specifically provided that King County would pay Snohomish County $70 million for recreational facilities and improvements, build a community resource center, make public safety improvements, and provide for habitat mitigation, collectively referred to as "community mitigation." CP at 5735. Among other things, King County agreed to build a community center to replace the Bear Creek Grange Hall that would be demolished to make way for Brightwater. The grange hall had been used by the local community for meetings, weddings, dances, and other events, and King County pledged that the new community center would be available as a substitute. King County also agreed to fund four habitat mitigation projects in the Little Bear Creek basin, improve roads in the area, and build a park. Little Bear Creek is a salmon bearing stream that crosses the Brightwater site. No payments would be made if the Brightwater permits were not approved. The settlement agreement also specifically stated that "the parties intend to enter into a development agreement governing the processing of permits for the construction of the Brightwater wastewater treatment plant" under RCW 36.70B.170, a statute that specifically authorizes local governments to enter into development agreements with developers. CP at 5735. The counties agreed that any appeals from the hearing examiner's decision would go directly to court instead of the Snohomish County Council.

8

King County issued a bond to pay the capital costs of the plant, secured primarily by sewage revenues and new capacity charges. It appears that bond revenues were paid into King County's Wastewater Capital Fund. According to King County, the settlement mitigation was paid "almost exclusively" from bond proceeds rather than directly from sewage treatment fees charged to the districts. CP at 5437. King County submitted evidence that "the bonds will be repaid almost entirely from 'capacity charges' and sewage disposal charges paid by new ratepayers." *Id.* The plant began treating wastewater in fall 2011 and was substantially finished a year later.

In 2008, plaintiffs Cedar River Water and Sewer District and Soos Creek Water and Sewer District brought this suit against King County, Snohomish County, and the other 32 entities that act as sewage utilities in King County. The districts are municipal corporations formed under Title 57 RCW, and both have long term contracts with King County for sewage disposal. The plaintiffs argued that the community mitigation outlined in the settlement was excessive; that there was too tenuous a connection between impacts caused by the treatment plant and some of the mitigation projects; that King County improperly used sewage treatment revenue for nonsewage related costs, including overhead expenses, the Culver Fund projects, and excessive payments to StockPot Soups; that King County was impermissibly disposing of reclaimed water by selling it; that the county had violated trust and fiduciary obligations to the districts; and that the county violated its contractual and

statutory duties to the districts. Later, the districts alleged that the county was not properly calculating a credit enhancement fee it charges the water districts for backing their bonds.

Many of the districts' claims were dismissed in a series of summary judgment rulings. In July 2009, Judge Felnagle found that the strict time limits of the Land Use Petition Act (LUPA), ch. 36.70C, applied to "any claims by plaintiffs challenging the validity, legality or enforceability of the Settlement Agreement, including any land use aspects of that Agreement," and dismissed those claims at summary judgment. CP at 18710. He allowed the districts to proceed on their claims that "the so-called 'community mitigation' projects set forth in the Settlement Agreement lack a sufficient nexus to sewage disposal to be paid for with money from King County's Water Quality Fund." CP at 18710. That December, he found that each of the challenged projects were "in some way, mitigating against the negative impacts of siting a sewage treatment plant . . . in your neighborhood[,]" and dismissed the challenges to the projects on their merits. 4 Verbatim Report of Proceedings (VRP) (Dec. 11, 2009) at 60-61 (oral ruling); CP at 18713-17, 18719-23 (summary judgment orders). That October, the judge dismissed the districts' breach of fiduciary duty and trust claims, finding that the county had no such obligations to the sewage districts.

In February 2010, Judge Felnagle dismissed the districts' claims relating to the county's authority to sell and distribute reclaimed water. Later that year, he dismissed

some affirmative defenses King County wished to present. 10 VRP (June 4, 2010) at 44.

The remaining claims went to a six-week bench trial. Judge Felnagle rejected most of the districts' remaining claims in an extensive written ruling. However, Judge Felnagle agreed with the plaintiffs that a $2 million "job retention" payment to StockPot was not properly part of the capital costs of Brightwater, but instead "primarily benefited the general public and thus should have come from a funding source other than the Water Quality Fund." CP at 18682. Judge Felnagle also awarded "12% prejudgment and postjudgment interest" and deferred the question of attorney fees until the case was resolved on appeal. *Id.*[3] We accepted direct review. The Washington Association of Prosecuting Attorneys submitted an amicus brief in support of King and Snohomish Counties. Washington State Auditor Brian Sonntag submitted a brief that was explicitly not in favor of either party but urges a narrow interpretation of RCW 43.09.210, among other things.

ANALYSIS

We review questions of law de novo. *Udall v. T.D. Escrow Servs., Inc.*, 159 Wn.2d 903, 908, 154 P.3d 882 (2007) (citing *Berrocal v. Fernandez*, 155 Wn.2d 585, 590, 121 P.3d 82 (2005)). We review verdicts for substantial evidence, taking all inferences in favor of the verdict. *See Indus. Indem. Co. of Nw., Inc. v. Kallevig*, 114

---

[3]Judge Felnagle has not entered final judgment and has stayed further proceedings on the remaining issues pending resolution of this appeal.

11

Wn.2d 907, 916, 792 P.2d 520 (1990) (citing *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 67, 738 P.2d 665 (1987)).

Initially, we consider two overarching issues that bear on many of the issues before us. First, the districts contend that King County has "trust or fiduciary obligations as to how it used the sewage utility fund" on the grounds that the Water Quality Fund is a restricted fund, and "[i]t has long been held in Washington that a restricted fund is in the nature of a trust, and equity should treat it accordingly." Br. of Appellants at 35-36 (citing *City of Longview v. Longview Co.*, 21 Wn.2d 248, 254, 150 P.2d 395 (1944)); 15 EUGENE MCQUILLIN, MUNICIPAL CORPORATIONS § 39.56, at 181-82 (3d ed. 2005). Judge Felnagle dismissed the districts' arguments at summary judgment. We affirm.

Under modern law, holding funds for a purpose does not, by itself, establish a trust or fiduciary relationship. *See, e.g., Thompson v. Atl. Richfield Co.*, 673 F. Supp. 1026, 1028 (W.D. Wash. 1987)). Generally, "the 'key element' is whether the parties intended a trust relationship rather than a contractual relationship." *Id.* (quoting *In re Thornton*, 544 F.2d 1005, 1006 (9th Cir. 1976)). Judge Felnagle examined the evidence presented and found that no trust had been created, and none needed to be implied by law.

We recently rejected an attempt to cast a government agency as a fiduciary when it collected funds based on theories rooted in "mid-twentieth century cases that have referred to retirement boards as trustees." *Retired Pub. Employees Council v.*

*Charles*, 148 Wn.2d 602, 621, 62 P.3d 470 (2003). In *Charles*, this court surveyed the relevant law and found that the mere collection of funds for a purpose did not create a trust absent specific intent to do so. *Id.* at 622-23; *see also Thompson*, 673 F. Supp. at 1028. Instead, a trust would be implied only if there was evidence of intent to create one. *Charles*, 148 Wn.2d at 622-23. No such evidence appears here.

The districts draw our attention to several cases where the court observed that particular funds were held in trust, whether or not a formal trust had been established. *E.g.*, *Longview Co.*, 21 Wn.2d at 254; *Keyes v. City of Tacoma*, 12 Wn.2d 54, 57, 120 P.2d 533 (1941). But in those cases, local improvement districts held funds in trust because they were raised by the sale of bonds for a very particular purpose. Nothing in those cases suggests that fees paid for a propriety government service are necessarily held in trust. Instead, there must be strong evidence of an intent to create a trust, such as specific direction from the legislature, before we impose trust or fiduciary duties on an agency. *See, e.g.*, *Charles*, 148 Wn.2d at 622-23.[4] We find no such evidence here. We affirm the trial court's ruling that King County is not a fiduciary of the districts.

---

[4] The districts also call our attention to *State v. Jim*, 173 Wn.2d 672, 687, 273 P.3d 434 (2012), where we noted that "[a] trust or fiduciary relationship can exist '(unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection'" (quoting *United States v. Mitchell*, 463 U.S. 206, 225, 103 S. Ct. 2961, 77 L. Ed. 2d 580 (1983)). But that was in the context of whether the federal government was holding resources in trust for a tribe given the background statutory scheme and the existence of "a trustee . . . a beneficiary . . . and a trust corpus." 463 U.S. at 207. Such specific evidence of an intent to establish a trust or fiduciary relationship is not present here.

Based on their trust and fiduciary duty theories, the districts argue that King County should have borne the burden of proof on whether it used sewage funds properly. Generally, plaintiffs bear the burden of proof on all elements of their claims. *E.g., Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). The districts also contend that we should reverse the burden because, they argue, King County had peculiar or exclusive knowledge relating the Water Quality Fund and to the claims. When information necessary to proof "is exclusively within the knowledge of one or the other of the parties, the burden would be upon the party possessed of that knowledge to make the proof." *Jolliffe v. N. Pac. Ry.*, 52 Wash. 433, 436, 100 P. 977 (1909). But the districts have not shown that any information is exclusively in the hands of King County, or any other reason why we should reverse the usual burden of proof. We decline to do so.

*1. LUPA*

After protracted litigation, King and Snohomish Counties settled their Brightwater disputes in late 2005. As part of the settlement, the counties agreed "to enter into a development agreement governing the processing of permits for the construction of the Brightwater wastewater treatment plant and related facilities," and King County agreed to pay an additional $70 million in community mitigation.[5] CP at

---

[5] King County agreed to pay $30,400,000 for recreational facilities and improvements, $2,950,000 to replace a Grange Hall that had to be torn down to build the facility with a community center, $25,850,000 for public safety improvements, and $10,800,000 for habitat mitigation. It is not clear from the settlement agreement if King County committed itself to

5735. The settlement agreement was contingent on the Snohomish County Council approving the development agreement, which was attached to the settlement agreement as an exhibit. Among many other things, the development agreement set forth "the permitting standards and conditions, certain mitigation measures, and permit process governing the review and construction of King County's Wastewater Treatment plant." CP at 5743. The Snohomish County Council approved the settlement agreement after one public hearing in October 2005 and the development agreement after another hearing that December.

The counties submitted the development and settlement agreement to a Snohomish County hearing examiner. The Sno-King Environmental Alliance and the city of Woodinville both opposed approval. After a public hearing over two days in April, the hearing examiner approved the project on May 5, 2006, with some conditions that are not before us.[6] More than two years later, the districts filed this case. Two years after that, King County moved for summary judgment in the case before us on "all claims that challenge the Development and Settlement Agreements between King and Snohomish Counties, including the scope of mitigation required by Snohomish County and agreed to by King County" on the grounds that the two agreements "constitute a single land use decision" and the districts' challenge was time barred under LUPA. CP at 90-91. On the same day, Snohomish County also

---

paying $70 million for these community mitigation projects or only up to $70 million. We need not resolve that ambiguity, but we note that it is reflected in the parties' briefing.

[6] The city of Woodinville filed a LUPA petition challenging the hearing examiner's decision on May 28, 2006. Judge Allendoerfer dismissed the petition as untimely.

15

filed for summary judgment. It agreed with King County that the districts' action was time barred under LUPA. It also argued that the districts had no standing to challenge the contract between the counties and, to the extent the districts were bringing a tort claim, that they had failed to file a required damage claim before filing suit.

The counties were initially only partially successful on their summary judgment motions. Judge Felnagle found that the "Settlement Agreement . . . read in conjunction with the . . . Development Agreement between the two counties constitutes at least in part a 'land use decision' within the meaning of the Land Use Petition Act." CP at 18710. Based on that finding, he dismissed the districts' challenges to the "validity, legality or enforceability of the Settlement Agreement, including any land use aspects of that Agreement," as time barred under LUPA. *Id.*[7] However, Judge Felnagle allowed the districts to pursue their claims that the specific community mitigation projects agreed to in the settlement agreement lacked sufficient nexus to sewage disposal to be funded out of King County's Water Quality Fund. Those claims were dismissed in a subsequent summary judgment order that will be reviewed below.

Our legislature enacted LUPA to establish "uniform, expedited appeal procedures and uniform criteria for reviewing [land use decisions made by local jurisdictions], in order to provide consistent, predictable, and timely judicial review."

---

[7] The trial court's order and the parties' briefing to this court do not make clear what claims were specifically encompassed by this dismissal. We note that many of the claims have not yet been litigated and await our resolution of these first-level issues.

RCW 36.70C.010. "LUPA embodies the same idea expressed by this court in pre-LUPA decisions—that even illegal decisions must be challenged in a timely, appropriate manner." *Habitat Watch v. Skagit County*, 155 Wn.2d 397, 407, 120 P.3d 56 (2005) (citing *Pierce v. King County*, 62 Wn.2d 324, 334, 382 P.2d 628 (1963)). Washington courts have rejected the argument that the LUPA time limit runs only against entities that had notice, standing, or were aggrieved under the statute. *See, e.g., Samuel's Furniture, Inc. v. Dep't of Ecology*, 147 Wn.2d 440, 462, 54 P.3d 1194 (2002) (no requirement of individualized notice for time limit to apply); *Chelan County v. Nykreim*, 146 Wn.2d 904, 935, 52 P.3d 1 (2002) (neighbor lacked standing and had not shown he was aggrieved).

This court has not had much opportunity to consider development agreements under chapter 36.70B RCW, perhaps because parties to the agreements rarely challenge them. Development agreements are also a fairly new instrument to resolve land use disputes. Former Governor Lowry's task force on regulatory reform proposed them in 1994 as part of an effort to simplify and harmonize land use regulation and review. GOVERNOR'S TASK FORCE ON REGULATORY REFORM, FINAL REPORT 1, 51 (1994). The legislature specifically approved of development agreements in 1995 as part of a fairly comprehensive overhaul of land use law. *See*

17

LAWS OF 1995, ch. 347, § 501 (codified primarily in chapter 36.70A-.70C RCW); *see also* H.B. Rep. on H.B. 1724, 54th Leg., Reg. Sess. (Wash. 1995).[8]

Under the statute:

(1) A local government may enter into a development agreement with a person having ownership or control of real property within its jurisdiction. A city may enter into a development agreement for real property outside its boundaries as part of a proposed annexation or a service agreement. A development agreement must set forth the development standards and other provisions that shall apply to and govern and vest the development, use, and mitigation of the development of the real property for the duration specified in the agreement. A development agreement shall be consistent with applicable development regulations adopted by a local government planning under chapter 36.70A RCW.

. . . .

(3) For the purposes of this section, "development standards" includes, but is not limited to:

(a) Project elements such as permitted uses, residential densities, and nonresidential densities and intensities or building sizes;

---

[8] The legislature made its intent clear:

The legislature finds that the lack of certainty in the approval of development projects can result in a waste of public and private resources, escalate housing costs for consumers and discourage the commitment to comprehensive planning which would make maximum efficient use of resources at the least economic cost to the public. Assurance to a development project applicant that upon government approval the project may proceed in accordance with existing policies and regulations, and subject to conditions of approval, all as set forth in a development agreement, will strengthen the public planning process, encourage private participation and comprehensive planning, and reduce the economic costs of development. Further, the lack of public facilities and services is a serious impediment to development of new housing and commercial uses. Project applicants and local governments may include provisions and agreements whereby applicants are reimbursed over time for financing public facilities. It is the intent of the legislature by [RCW 36.70B.170 through 36.70B.210] to allow local governments and owners and developers of real property to enter into development agreements.

LAWS OF 1995, ch. 347, § 501.

(b) The amount and payment of impact fees imposed or agreed to in accordance with any applicable provisions of state law, any reimbursement provisions, other financial contributions by the property owner, inspection fees, or dedications;

(c) Mitigation measures, development conditions, and other requirements under chapter 43.21C RCW;

(d) Design standards such as maximum heights, setbacks, drainage and water quality requirements, landscaping, and other development features;

. . . .

(h) Review procedures and standards for implementing decisions;

(i) A build-out or vesting period for applicable standards; and

(j) Any other appropriate development requirement or procedure.

(4) The execution of a development agreement is a proper exercise of county and city police power and contract authority. A development agreement may obligate a party to fund or provide services, infrastructure, or other facilities. A development agreement shall reserve authority to impose new or different regulations to the extent required by a serious threat to public health and safety.

RCW 36.70B.170. Local governments must hold a public hearing before approving a development agreement and must approve it by either ordinance or resolution, as happened here. RCW 36.70B.200. Development agreements that relate to "a project permit application" are subject to the same judicial review under LUPA, including LUPA's strict 21-day deadline for seeking judicial review of land use decisions. LAWS OF 1995, ch. 347, § 505 (codified as RCW 36.70B.200); RCW 36.70C.040(3), (4).

19

The districts contend that neither the settlement agreement nor the development agreements are subject to LUPA. They have not provided us with any specific argument as to why the development agreement does not qualify under RCW 36.70B.170. At least on its face, the development agreement appears statutorily adequate. It is between the regulating authority and the developer. RCW 36.70B.170(1). It sets forth the development standards and conditions for the project. *Id.* It sets forth the specific county code provisions that apply. *Id.* It includes the project elements. RCW 36.70B.170(3)(a). It describes the mitigation the parties anticipate and recognizes the hearing examiner's authority to impose more. RCW 36.70B.170(3)(c). It recognizes the hearing examiner's authority to review the specific mitigation required. The districts have failed to show that the development agreement itself was not subject to LUPA's time limit.

Next, the districts challenge Judge Felnagle's conclusion that the two counties intended the settlement and development agreements to be integrated as one enforceable development agreement. 1 VPR (May 29, 2009) at 49 ("The attempt to divorce the settlement agreement from the development agreement is strained and not persuasive to the Court."). Ample evidence supports Judge Felnagle's conclusion that the parties intended the agreements to be integrated. Among other things, both parties to the agreements agree that they are integrated. This is consistent with the two agreements themselves. The settlement agreement states that "[p]ursuant to RCW 36.70B.170, the parties intend to enter into a development agreement governing the

20

processing of permits" and that "[t]he proposed Development Agreement is set forth in Exhibit A, which is attached hereto and incorporated herein." CP at 5735. The development agreement makes the parallel statement that "[t]his Development Agreement is an exhibit to and a part of the Settlement Agreement executed between Snohomish County and King County on the subject of Brightwater." CP at 5743. Generally, "[i]nstruments which are part of the same transaction, relate to the same subject matter and are executed at the same time should be read and construed together as one contract." *Turner v. Wexler*, 14 Wn. App. 143, 146, 538 P.2d 877 (1975) (citing *Am. Pipe & Constr. Co. v. Harbor Constr. Co.*, 51 Wn.2d 258, 265, 317 P.2d 521 (1957)). Further, "[i]f the parties to a contract clearly and unequivocally incorporate by reference into their contract some other document, that document becomes part of their contract." *Satomi Owners Ass'n v. Satomi, LLC*, 167 Wn.2d 781, 801, 225 P.3d 213 (2009) (citing *Wash. Trust Bank v. Circle K Corp.*, 15 Wn. App. 89, 93, 546 P.2d 1249 (1976)).

Third, the districts contend that a close reading of the two agreements shows that the development agreement stands on its own. They note that under the settlement agreement, "any permits subsequently issued for Brightwater [will] continue in effect regardless of any future invalidation of . . . the 'community mitigation' payments pursuant to the Settlement Agreement." Reply Br. of Appellants at 6 & n.15 (citing Settlement Agreement § 6.5, CP at 5738). Therefore,

they reason, the two agreements are not integrated since the obligations in one do not depend on the obligations in the other. This is a strained way to read § 6.5. It says:

> Compliance with Applicable Laws. The parties intend that the payment of mitigation funds to Snohomish County shall be in compliance with all applicable laws and regulations. In the event that a court of competent jurisdiction finds that any expenditures or payment of funds by King County for the benefit of impacted communities required under this Agreement shall be illegal or in violation of any law or regulation, Snohomish County shall promptly return any unexpended funds to King County where required by such court order. . . . . In the event that any of the Community Mitigation funds are held by a court to be illegally imposed, Snohomish County will nonetheless take no action to withdraw or otherwise invalidate any permits or approvals it has issued and the Parties agree to discuss any new concerns related to mitigation issues.

CP at 5738. Read in context, the parties agreed that their agreement would be binding unless declared by a court to be invalid, not that the parties intended the development and settlement agreements to be separate from each other.

Fourth, the districts contend that LUPA's time limits should not run against them because they were not aggrieved by the settlement and development agreements themselves, only by the funding source of the community mitigation, and because they lacked standing under LUPA. However, this court has consistently rejected the argument that the LUPA time limit runs only against entities that had notice, standing, or were aggrieved under the statute. *See, e.g., Samuel's Furniture*, 147 Wn.2d at 462;[9] *Nykreim*, 146 Wn.2d at 935. Further, it would undermine the intent of LUPA to

---

[9] While *Samuel's Furniture* garnered a vigorous dissent on that issue, the legislature has not amended LUPA in response. "If the legislature does not register its disapproval of a court opinion, at some point that silence itself is evidence of legislative approval." *1000 Friends of*

22

allow what is in essence an untimely collateral challenge to a land use decision by framing it as non-LUPA challenge. It is an interesting question whether an otherwise-improper mitigation payment could be effectively immunized from review by placing it into a development agreement that was not timely challenged by a proper party. However, given that the trial judge separately considered whether there was a sufficient nexus between the mitigation paid and the impacts caused, we need not decide it here. The districts have not shown Judge Felnagle erred in concluding that their challenges to the "validity, legality, or enforceability of the Settlement Agreement, including any land use aspects of that Agreement," CP at 18710, were time barred under LUPA.[10]

### 2. *Community Mitigation*

After granting partial summary judgment based on LUPA, Judge Felnagle allowed the districts to proceed on their claims

> that the so-called "community mitigation" projects set forth in the Settlement Agreement lack a sufficient nexus to sewage disposal to be paid for with money from King County's Water Quality Fund, or that the payments made or to be made by King County under the Settlement Agreement could not lawfully

---

*Wash. v. McFarland*, 159 Wn.2d 165, 181, 149 P.3d 616 (2006) (citing *State v. Coe*, 109 Wn.2d 832, 846, 750 P.2d 208 (1988)).

[10] The districts also contend that LUPA's exception for "[c]laims provided by any law for monetary damages or compensation," RCW 36.70C.030(1)(c), applies. But we need not reach this issue because Judge Felnagle considered and resolved all of the issues addressed in the districts' appellate briefs, and we affirm Judge Felnagle's rulings. If there are other issues that Judge Felnagle failed to address on the ground that they were barred by LUPA, the districts have not briefed them. Given our disposition, we decline to reach whether the districts were entitled to challenge the settlement under *Warburton v. Tacoma School District No. 10*, 55 Wn.2d 746, 350 P.2d 161 (1960).

be made out of the Water Quality Fund, or that King County must reimburse the Water Quality Fund for any such payments

*Id.* After relevant discovery was complete, the counties moved again for summary judgment. The counties argued that the community mitigation was proper, it was properly chargeable to the Water Quality Fund, that the districts' claims were untimely, and that the districts lacked standing to challenge the settlement. Critically, the counties offered evidence that each of projects at issue mitigated the impact of the plant. CP at 5403-39 (Decl. of Director of the King County Wastewater Treatment Division Christie True, describing odor, traffic, construction, environment, loss of grange hall, habitat damage, and how the mitigation addressed each); CP at 4962-82 (Decl. of Michael Popiwny, King County Wastewater Treatment Division Architectural Design and Mitigation Manager, describing effects of construction, aesthetics, amenities, recreation, public safety, habitat, and watershed).

The districts opposed summary judgment on the grounds "that King County's use of the Water Quality Fund to pay for the projects set forth in the Settlement Agreement was in violation of state and local law." CP at 932 (emphasis omitted). They sought to have King County reimburse the Water Quality Fund for the cost of community mitigation and be prohibited from using the "unlawful expenditures from the Water Quality Fund in calculating the sewer rates charged to plaintiffs." *Id.* at 932.

Generally speaking, a local government can require that a property developer

mitigate its project's impacts, but cannot use that authority to impose unrelated fees.

*E.g.*, former RCW 82.02.020 (2005);[11] *Dolan v. City of Tigard*, 512 U.S. 374, 114 S.

Ct. 2309, 129 L. Ed. 2d 304 (1994); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825,

107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987). There are similar limitations on a

municipal organization's power to use funds collected for one particular proprietary

purpose for any other purpose. *E.g.*, *Okeson v. City of Seattle*, 150 Wn.2d 540, 551,

78 P.3d 1279 (2003). Similar principles are reflected in the parties' contracts, the

King County Charter, and the King County Code. Under the charter, funds raised by

"a distinct functional unit" of the county for that function can be used only for that

function. KING COUNTY CHARTER § 230.10.10.[12] The King County Code

---

[11] Except as provided in RCW 82.02.050 through 82.02.090, no county, city, town, or other municipal corporation shall impose any tax, fee, or charge, either direct or indirect, on the construction or reconstruction of residential buildings, commercial buildings, industrial buildings, or on any other building or building space or appurtenance thereto, or on the development, subdivision, classification, or reclassification of land. However, this section does not preclude dedications of land or easements within the proposed development or plat which the county, city, town, or other municipal corporation can demonstrate are reasonably necessary as a direct result of the proposed development or plat to which the dedication of land or easement is to apply.

This section does not prohibit voluntary agreements with counties, cities, towns, or other municipal corporations that allow a payment in lieu of a dedication of land or to mitigate a direct impact that has been identified as a consequence of a proposed development, subdivision, or plat.

Former RCW 82.02.020 (2005).

[12] **Metropolitan Municipal Functions.**
Each metropolitan municipal function authorized to be performed by the county pursuant to RCW ch. 35.58 shall be operated as a distinct functional unit. Revenues or property received for such functions shall never be used for any purposes other than the operating

specifically requires the same of the wastewater division. KING COUNTY CODE (KCC) 28.86.160(C)(1) (FP-10).[13] Under the contracts, the sewage disposal rates are based on the "total monetary requirements for the disposal of sewage," CP at 756, which includes, among other things, "the cost of administration, operation, maintenance, repair and replacement of the Metropolitan Sewerage System . . . [and costs related to] the acquisition, construction or use of sewerage facilities." Trial Ex. 9, at 4 (Soos Creek Contract). Simply put, there must be a sufficient nexus between the mitigation and the project impacts for it to be proper and properly chargeable to the Water Quality Fund under any of these authorities.[14]

After reviewing the evidence, Judge Felnagle found that the mitigation was proper, that it was properly part of the capital cost of Brightwater's construction, and that it was properly paid for out of the Water Quality Fund. Again, we review

---

expenses thereof, interest on and redemption of the outstanding debt thereof, capital improvements, and the reduction of rates and charges for such functions. (Ord. 10530 § 1, 1992).

KING COUNTY CHARTER § 230.10.10.

[13] The assets of the wastewater system are pledged to be used for the exclusive benefit of the wastewater system including operating expenses, debt service payments, asset assignment and the capital program associated therewith. The system shall be fully reimbursed for the value associated with any use or transfer of such assets for other county government purposes.

KING COUNTY CODE (KCC) 28.86.160(C)(1) (FP-10).

[14] Our concurring colleague raises an interesting point about whether the districts have standing to bring claims grounded in the Fifth Amendment to the United States Constitution, the *Nollan/Dolan* line of cases, or RCW 82.02.020. Since the parties do not frame the issue in quite that way, we have been deprived of valuable briefing on the subject and decline to reach it. *See* RAP 13.7(b). *But cf. Alverado v. Wash. Pub. Power Supply Sys.*, 111 Wn.2d 424, 429, 759 P.2d 427 (1988) (citing *Siegler v. Kuhlman*, 81 Wn.2d 448, 502 P.2d 1181 (1972)).

questions of law de novo. *Udall*, 159 Wn.2d at 908 (citing *Berrocal*, 155 Wn.2d at 590). We will affirm a trial judge's factual findings when there is "a sufficient quantity of evidence in the record to persuade a reasonable person that the declared premise is true." *Isla Verde Int'l Holdings, Inc. v. City of Camas*, 146 Wn.2d 740, 751-52, 49 P.3d 867 (2002) (citing *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000)). Finding no error, we affirm.

> Specifically, Judge Felnagle observed that
>
> it looks to me, in looking at each of these projects, that they are all, in some way, mitigating against the negative impacts of siting a sewage treatment plant or having a sewage treatment plant in your neighborhood. And whether you call it incentives and amenities or you use some other term – and I don't necessarily think that incentives and amenities is the only way you could term this – but it's a good concept for what the test ought to be.
>
> It needs to be a mitigation of the siting and the development, the creation of this capital improvement, and all of these things do go to assisting in creating this capital improvement, which is, I believe, the necessary nexus, which is why I'm prepared to grant summary judgment for the defendants.

4 VPR (Dec. 11, 2009) at 60-61.

We recognize there are many potential nuances to whether there is a sufficient nexus between a project and its mitigation. In many cases, sufficiency will depend on the specific statutory or constitutional authorization or limitation at issue. But this case does not turn on finely parsed facts. The counties offered ample unrebutted evidence of a sufficient nexus between the mitigation projects and the effects of having this particular sewage treatment plant sited in an area. In response, the districts offered evidence that tended to show that prior to settlement, King County

27

resisted funding all of the mitigation Snohomish County believed was appropriate. Generously construed, the districts' evidence tended to show that King County's agreement to fund the mitigation was motivated more by a desire to settle the myriad lawsuits and build the Brightwater treatment plant than by a sincere belief that it was legally obligated to fund every aspect of the mitigation it ultimately agreed to provide. But that simply highlights that the two counties were actually adverse before settlement. It does not create a material question of fact of whether there was a sufficient nexus between Brightwater and the mitigation. We found no evidence in the record that tended to show any particular mitigation project was not sufficiently connected to the effects of the plant. In fact, the districts' own evidence showed that county officials were well aware that there needed to be a nexus between the effects of the project and the mitigation.

The districts assert that there is no such thing as "community mitigation" under Washington law. But the term was merely the label the counties used in their settlement agreement to describe the various types of mitigation in contention. It carries no legal significance.

The districts also argue that since the final environmental impact statement (EIS) for Brightwater did not identify all the specific projects listed in the settlement agreement, the projects were not reasonably necessary. But Snohomish County challenged that very EIS as being inadequate for not identifying Brightwater's full impacts and not proposing adequate mitigation. Further, the districts offer no

authority for the implicit proposition that only effects specifically listed in an EIS, challenged or not, can be lawfully mitigated, and we have found none ourselves. While different statutes use different terms, in essence, "mitigation" is available under several different statutory schemes. *See, e.g., City of Olympia v. Drebick*, 156 Wn.2d 289, 300-01, 126 P.3d 802 (2006) (discussing impact fees under the Growth Management Act (GMA), chapter 36.70A RCW, State Environmental Protection Act (SEPA), chapter 43.21C RCW, and the Local Transportation Act (LTA), chapter 39.92 RCW). For example, under GMA regulations, those seeking to build "essential public facilities" like sewage treatment plants are directed to consider "amenities or incentives for neighborhoods or jurisdictions in which the facilities are sited." Former WAC 365-195-340(2)(b)(vi) (1992); *see also* WAC 365-196-550.[15] SEPA regulations broadly define mitigation as "[c]ompensating for the impact by replacing, enhancing, or providing substitute resources or environments." WAC 197-11-768. Many statutes and regulations provide authority for broader mitigation than might be delineated in a typical EIS. *Drebick*, 156 Wn.2d at 300-01.

---

[15] In 2010, WAC 365-195-340 was repealed. Wash. St. Reg. 10-03-085 (Feb. 19, 2010). Currently, WAC 365-196-550 reads in relevant part:

> Counties and cities should consider the extent to which design conditions can be used to make a facility compatible with its surroundings. Counties and cities may also consider provisions for amenities or incentives for neighborhoods in which facilities are sited. Any conditions imposed must be necessary to mitigate an identified impact of the essential public facility.

WAC 365-196-550(6)(e).

We find that the districts failed to show that there was a material question of fact precluding summary judgment and affirm.[16]

### 3. Reclaimed Water

Brightwater produces a great deal of treated wastewater, known as reclaimed water. Reclaimed water is suitable for many, though not all, beneficial uses. RCW 90.46.010(15).[17] King County sells some of it, uses some at the Brightwater site itself, and pumps the rest a mile out into Puget Sound. The districts argue that King County does not have the lawful power to sell reclaimed water because, they contend, the distribution of water is the sole function of a municipal water utility, which King County is not. They challenge King County's power to use sewage funds to build a distribution system for reclaimed water on the theory that the two activities are distinct and revenues raised for one purpose may not be used for another. *See Okeson*, 150 Wn.2d at 551. Thus, they contend, the sewage treatment utilities should not have to bear the cost of building the disposal systems for the reclaimed water. Judge Felnagle found that operating a sewage system necessarily "includes the

---

[16] Judge Felnagle's December 2009 written ruling reaches only the districts' breach of contract claims, but his oral ruling was more sweeping. His later order and judgment under CR 54(b) on level one claims makes clear that he dismissed the mitigation claims "in their entirety as a matter of law." CP at 18700. This would include the claims under the RCW 82.02.020 pleaded in the complaint, as well as the claims under the King County Code and King County Charter. The districts contend that the trial judge never addressed the merits of their RCW 82.02.020 claim, but those merits appear to us to be fairly encompassed by his oral ruling. Even if he did not, however, the districts have not shown that a RCW 82.02.020 claim would not be subject to LUPA's strict time limit, and thus properly dismissed in the July 2009 summary judgment order.

[17] "'Reclaimed water' means water derived in any part from wastewater with a domestic wastewater component that has been adequately and reliably treated, so that it can be used for beneficial purposes. Reclaimed water is not considered a wastewater." RCW 90.46.010(15).

distribution of reclaimed water" and dismissed the claim at summary judgment. 5 VRP (Feb. 5, 2009) at 49. We agree and affirm.

King County concedes that it is not a municipal water utility. It contends that disposing of reclaimed water is a necessary part of treating sewage and that selling the reclaimed water benefits ratepayers because the revenues return to the Water Quality Fund, reducing disposal rates. It also contends that the Wastewater Treatment Division will recoup the cost of building the distribution system in 40 years, another benefit to the ratepayers.

We agree. Disposing of the reclaimed water is a necessary part of operating a sewage treatment plant, and the legislature has strongly urged beneficial use of the resource. Our legislature has directed the ecology and health departments to develop "an efficient and streamlined process for creating and implementing processes for the use of reclaimed water." RCW 90.46.005. Among other things,

> [t]he legislature further finds and declares that the utilization of reclaimed water by local communities for domestic, agricultural, industrial, recreational, and fish and wildlife habitat creation and enhancement purposes, including wetland enhancement, will contribute to the peace, health, safety, and welfare of the people of the state of Washington. To the extent reclaimed water is appropriate for beneficial uses, it should be so used to preserve potable water for drinking purposes, contribute to the restoration and protection of instream flows that are crucial to preservation of the state's salmonid fishery resources, contribute to the restoration of Puget Sound by reducing wastewater discharge
> . . . .

RCW 90.46.005. The Department of Ecology strongly urged the county to pursue reclaimed water projects when building Brightwater. Perhaps most importantly, the

31

Department of Natural Resources (DNR) required King County to minimize its use of Puget Sound to dispose of reclaimed water as a condition of granting an Aquatic Lands Outfall Easement. King County submitted unrebutted evidence that had it not "agreed to these conditions, it would have been unlikely that King County would have received the DNR easement to allow for the siting and construction of the Brightwater outfall." CP at 7083-84.

A close look at the relevant statutes demonstrates that our legislature intended operators of sewage treatment plants to put reclaimed water to good use and contemplated that could include selling it. Chapter 90.46 RCW, "Reclaimed Water Use," provides in part:

> The owner of a wastewater treatment facility that is reclaiming water with a permit issued under this chapter has the exclusive right to any reclaimed water generated by the wastewater treatment facility. Use, distribution, storage, and the recovery from storage of reclaimed water permitted under this chapter is exempt from the permit requirements of RCW 90.03.250 and 90.44.060, provided that a permit for recovery of reclaimed water from aquifer storage shall be reviewed under the standards established under RCW 90.03.370(2) for aquifer storage and recovery projects. Revenues derived from the reclaimed water facility shall be used only to offset the cost of operation of the wastewater utility fund or other applicable source of systemwide funding.

RCW 90.46.120(1). Nothing in chapter 90.46 RCW indicates the legislature intended to require sewage treatment plants to become water utilities before they can otherwise follow the statutory directive to make broad use of reclaimed water, including by sale for suitable uses. The limitations on the use of revenues would otherwise make little sense. Further, Washington's Water Pollution Control Act, chapter 90.48 RCW,

requires sewage treatment facilities plans to consider "opportunities for the use of reclaimed water," RCW 90.48.112, which strongly indicates that wastewater treatment plants are authorized to make beneficial use of the resource. Finally, we would hardly be the first State to authorize municipalities to sell reclaimed water. *See* Nathan S. Bracken, *Water Reuse in the West: State Programs and Institutional Issues*, 18 HASTINGS W.-NW. J. ENVTL. L. & POL'Y 451, 471, 473 (2012).

The districts contend that the sale of reclaimed water primarily benefits the county as a whole, not the individual sewage utility customers, and therefore, the general fund, not the division, should bear the costs of having built the distribution system. But the sewage ratepayers are specifically benefited because the revenues return to the Water Quality Fund, reducing disposal rates. CP at 8162, 8170-71, 8657-60. This is consistent with the statutory directive that "[r]evenues derived from the reclaimed water facility shall be used only to offset the cost of operation of the wastewater utility fund or other applicable source of systemwide funding." RCW 90.46.120.

Finding no error, we affirm.

*4. StockPot Soups*

The districts contend that King County made overly generous payments to a private business to obtain its acquiescence to displacement by Brightwater and that all or some of the funds should have come from general county funds rather than the Water Quality Fund. After trial, Judge Fenagle largely rejected these claims. We

33

largely affirm, but we reverse the trial court's ruling that the $2 million paid for job retention was not properly considered mitigation.

Before Brightwater was built, StockPot Soups operated on property leased on the Woodinville North Business Park. King County considered purchasing or condemning the business park as part of the Brightwater plant. After considerable negotiation and some litigation, King County and StockPot Soups entered into a purchase and sale agreement in lieu of condemnation.[18]

The agreement gave StockPot two options. Under the local replacement site option, King County agreed to reimburse StockPot its actual relocation fees up to a negotiated cap of $16.17 million. The county actually reimbursed StockPot about $15.6 million. Under the nonlocal replacement site option, King County only agreed

---

[18] The "Agreement for the Purchase and Sale of Property in Lieu of Condemnation" between the parties is not a model of clarity. It provides in most relevant part:

> If StockPot sends King County Notice of Intent to Relocate Locally, then King County shall reimburse Stock Sixteen Million One Hundred Seventy Thousand Dollars ($16,170,000) (the "Local Replacement Site Administrative Settlement Amount"). If StockPot sends King County Notice of Intent Not to Relocate Locally, then King County shall reimburse StockPot Five Million Five Hundred Thousand Dollars ($5,500,000) (the "non-Local Replacement Site Administrative Settlement Amount"). King County and StockPot agree that (i) for the Local Replacement Site Option these sums represent amounts paid for the Acquired Personal Property (as such term is defined in Section 3.4 hereof) and the cost of actual, reasonable and necessary, moving and related expenses and reestablishment expenses and (ii) for the Non-Local Replacement Site Option, these sums represent the cost of actual, reasonable and necessary moving and related expenses and reestablishment expenses.

Trial Ex. 90, at 5. While the districts are certainly correct that it seems peculiar that it would be cheaper to move across country than locally, there may be many perfectly appropriate factors driving the parties to make this agreement. Among other things, land and labor costs might be cheaper elsewhere.

to reimburse StockPot up to $5.5 million. If StockPot chose the local option, it was also eligible to receive an additional $2 million over time, subject to certain conditions.

The districts argue that only $5.5 million was properly payable as a capital expense of the plant and that anything more was for the general benefit of the county, not the sewage ratepayers. Judge Felnagle found that the full relocation fees under the local option were properly for the benefit of the sewage treatment plant but that the $2 million payment for job retention should not have been made out of restricted funds.

Essentially, the districts argue that King County and StockPot's relocation agreement establishes that the actual relocation costs were only $5.5 million, not the $15.6 the county actually paid. They contend that "[t]here is no logical reason why the relocation expenses would be greater for a local move." Br. of Appellant at 60. While we agree it seems peculiar that a local move would cost more than a nonlocal one, sometimes logic must give way to evidence. Since the trial judge was sitting as the trier of fact on this, the districts must show his factual findings were not supported by substantial evidence. *Kallevig*, 114 Wn.2d at 916 (citing *Boeing Co*, 108 Wn.2d at 67). They do not meet that standard.

King County was required to reimburse StockPot for its actual reasonable moving expenses. RCW 8.26.035;[19] WAC 468-100-301. StockPot was required to,

---

[19] Whenever a program or project to be undertaken by a displacing agency will result in the displacement of any person, the displacing agency shall provide for the payment to the displaced person of:

and did, document its moving costs in order to receive reimbursement. The trial judge heard this evidence regarding the actual costs incurred by StockPot and made a decision. While the issue was not without doubt prior to trial, substantial evidence supports his decision. We find no error and affirm.

King County contends that the $2 million job retention payment was properly part of the capital costs of the plant. It contends it was required by Snohomish County Ordinance 04-019(12)[20] to take steps to preserve jobs as a condition of allowing the

---

(a) Actual reasonable expenses in moving himself or herself, or his or her family, business, farm operation, or other personal property;

(b) Actual direct losses of tangible personal property as a result of moving or discontinuing a business or farm operation, but not to exceed an amount equal to the reasonable expenses that would have been required to relocate the property, in accordance with criteria established by the lead agency;

(c) Actual reasonable expenses in searching for a replacement business or farm; and

(d) Actual reasonable expenses necessary to reestablish a displaced farm, nonprofit organization, or small business at its new site, in accordance with criteria established by the lead agency, but not to exceed fifty thousand dollars.

RCW 8.26.035(1). This statute does not address whether the parties may agree that "actual reasonable expenses" can be contractually defined as something less than it actually is, but as the parties do not specifically raise the issue, we need not reach it.

[20] Among many other things, Snohomish County Ordinance 04-019 authorized a hearing examiner to grant a conditional use permit only if

(4) The proposal, as conditioned, adequately mitigates adverse impacts to . . . economic development and other identified impacts; [and]

. . . .

(6) The project sponsor has proposed mitigation measures that provide substantial assistance to displaced or impacted businesses in relocating within Snohomish County.

36

plant to be built. The trial court concluded that the ordinance had been invalidated by the Growth Management Hearing Board (GMHB). Unfortunately, this is not entirely accurate, though the trial court's confusion is understandable. The GMHB's opinion is lengthy and relates to three separate cases before the board. The board went line by line through the ordinance and found that many provisions violated the GMA because they allowed an application for an essential public facility to be denied when it was not "consistent with the comprehensive plan" or would be "materially detrimental to uses or property in the immediate vicinity." Trial Ex. 70, at 17. The board noted that under the GMA

> a local government may not deny a regional, state or federal EPF, nor may it include conditions that make it impracticable for the sponsor to build the project with the means at hand. King County correctly argues that many regional EPFs due to their scale and very nature, will inevitably be detrimental to some degree to surrounding uses; the Board finds therefore that the absolute regulatory requirement of 30.42C.100(1)(c) that a regional EPF not be materially detrimental to its surroundings does not comply with RCW 36.70A.200(5).

*Id.* However, the board found "that the other criteria listed [in the ordinance] are sufficiently clear that they are not impermissibly vague and over-reaching." *Id.* The ordinance contained a severability clause. Snohomish County Ordinance 04-019(9). Under enforceable portions of the ordinance, King County was required to provide for job retention as a condition of building the plant. Snohomish County Ordinance 04-

---

Snohomish County Ordinance 04-019(5) (Trial Ex. 65, at 8).

019 (Trial Ex. 65, at 8) (requiring that the project "adequately mitigates adverse impacts to . . . economic development and other identified impacts").

We find that the $2 million payment to StockPot was a necessary condition of approval of this project and reverse this portion of the trial judge's decision. However, we affirm the trial judge that the relocation expenses were appropriate.[21]

### 5. Culver Fund Projects

While the vast majority of the Wastewater Treatment Division's work relates to the collection and treatment of sewage, a small part of its work has gone toward other public education and water system improvements. For example, it has daylighted creeks that had been buried in storm drains, stenciled storm drains, distributed kits that divert car wash operations from the storm drains, and done quite a bit of habitat restoration around streams. The districts challenge the existence and scope of these Culver Fund projects under RCW 35.58.200, their contracts with the county, the King County Charter, and article VII, section 5 of the Washington State Constitution.[22]

The trial judge rejected these claims after trial. Judge Felnagle heard evidence that these projects affected general water quality and the efficacy of sewage treatment. Among other things, witnesses testified that surface and storm water infiltrated

---

[21] King County also argues that the settlement with StockPot is unassailable by a third party under *Warburton*, 55 Wn.2d 746. We leave for another day whether *Warburton* applies under these circumstances, where a third party is challenging the character of the funds used in settlement, not the settlement itself. Given our disposition, we also do not reach whether the trial judge properly awarded prejudgment interest.

[22] "No tax shall be levied except in pursuance of law; and every law imposing a tax shall state distinctly the object of the same to which only it shall be applied." WASH. CONST. art. VII, § 5. By its plain terms, it applies only to taxes, not fees such as are at issue here.

sewage pipes, degraded streams, and degraded Puget Sound, potentially reducing the amount of treated water the county would be permitted to dispose of there. After hearing that evidence and much, much more, Judge Felnagle concluded that "[w]astewater treatment is a broad enough concept to include water quality." CP at 18669. He also found that "King County has express statutory authority to include in sewage treatment rates the costs for Culver Fund projects and activities under RCW 35.58.200(4)." *Id.* Among other things, that statute authorizes the county "[t]o fix rates and charges for the use of metropolitan water pollution abatement facilities, and to expend the moneys so collected for the authorized water pollution abatement activities." RCW 35.58.200(4).

Judge Felnagle also found that the contracts with the districts contemplated that water treatment would be done under comprehensive plans that would evolve over time. It is undisputed that the regional wastewater plan contemplated the Culver Fund projects. Judge Felnagle found that the Culver Fund projects were encompassed in the "cost of administration, operation, maintenance, repair and replacement of the Metropolitan Sewerage System." CP at 18670. Relevantly, the contracts provide:

> Whereas, the public health, welfare and safety of . . . the residents of Metro require . . . the elimination of water pollution and the preservation of the fresh and salt water resources in the area . . .

Trial Ex. 3, at 1.

> The monthly sewage disposal charge payable to Metro shall be determined as follows:

(a) Prior to July 1st of each year Metro shall determine its total monetary requirements for the disposal of sewage during the next succeeding calendar year. Such requirements shall include the cost of administration, operation, maintenance, repair and replacement of the Metropolitan Sewerage System, establishment and maintenance of necessary working capital and reserves, the requirements of any resolution providing for the issuance of revenue bonds of Metro to finance the acquisition, construction or use of sewerage facilities, plus not to exceed 1% of the foregoing requirements for general administrative overhead costs.

Trial Ex. 9, at 4 (Soos Creek Contract § 5.3(a)).[23] Again, whether the Culver Fund projects are an appropriate use of sewage treatment fees turns on whether there is a sufficient nexus between those projects and the goals of sewage treatment. The trial judge, after hearing evidence, found that there was, and the districts have not shown that substantial evidence did not support the judge's findings.

Similar principles apply to the districts' argument that the Culver Fund projects are unlawful under the King County Charter, which says:

**Metropolitan Municipal Functions.**
Each metropolitan municipal function authorized to be performed by the county pursuant to RCW ch. 35.58 shall be operated as a distinct functional unit. Revenues or property received for such functions shall never be used for any purposes other than the operating expenses thereof, interest on and redemption of the outstanding debt thereof, capital improvements, and the reduction of rates and charges for such functions. (Ord. 10530 § 1, 1992)

KING COUNTY CHARTER § 230.10.10. The county adopted several financial policies (Financial Policy 8[24] and 10)[25] that specifically provide that the water quality

---

[23] The districts contend, and the counties do not dispute, that all the contracts between King County and the sewage utilities are substantially similar. CP at 8.
[24] Water quality improvement activities, programs and projects, in addition to those that are functions of sewage treatment, may be eligible for funding assistance from sewer rate revenues after consideration of criteria and limitations suggested by the metropolitan water pollution

improvement activities are a permissible expenditure of funds collected for sewage treatment. The districts contend that these financial policies are inconsistent with the charter. But this turns on whether the Culver Fund projects benefit the wastewater treatment division, which they have been repeatedly found to do. For example, the trial court found that "[t]he projects and activities funded by the Culver Fund are not a 'raid' on the [Water Quality Fund], but result in identifiable benefits to water quality and/or sewage treatment and disposal in the region, and are reasonably necessary to the operation of the wastewater treatment system." CP at 18668. Judge Felnagle also found that "King County . . . is authorized by RCW 35.58.200 to engage in water pollution abatement activities, including activities related to sewage treatment and disposal, and water quality improvements including the Culver Fund activities." CP at 18669.

The districts have not established that the judge's factual findings or conclusions of law that flowed from them were incorrect. We affirm.

---

abatement advisory committee, and, if deemed eligible, shall be limited to one and one half percent of the annual wastewater system operating budget. An annual report on activities, programs and projects funded will be made to the RWQC [(Regional Water Quality Committee)]. Alternative methods of providing a similar level of funding assistance for water quality improvement activities shall be transmitted to the RWQC and the council within seven months of policy adoption.

KCC 28.86.160(C) (FP-8).

[25] The assets of the wastewater system are pledged to be used for the exclusive benefit of the wastewater system including operating expenses, debt service payments, asset assignment and the capital program associated therewith. The system shall be fully reimbursed for the value associated with any use or transfer of such assets for other county government purposes.

KCC 28.86.160(C) (FP-10).

41

*6. Allocation of General Government Overhead*

King County allocates general overhead expenses to its different agencies through a complicated formula recommended by Deloitte and Touche. CP at 13422. Essentially, overhead costs are distributed in proportion to the share of the budget each agency represents, with considerable adjustments. *See also* KCC 4.04.045.[26] The Wastewater Treatment Division's budget has recently averaged about 5.7% of the county budget, and has been billed for about 5.7% of the overhead costs accordingly.

---

[26] **Overhead cost allocation policy.** The following policies shall guide the development and implementation of the county's overhead cost allocation plan for allocating current expense costs to other county funds:

A. The current expense fund may allocate costs to other county funds if it can be demonstrated that other county funds benefit from services provided by current expense funded agencies.

B. Wherever possible, the current expense cost to be allocated shall equal the benefit received by the county fund receiving the charge.

C. Recognizing that many current expense services are indirect and not easily quantifiable, overhead charges may be estimated.

D. Estimated overhead charges shall be calculated in a fair and consistent manner, utilizing a methodology which best matches the estimated cost of the services provided to the actual overhead charge.

E. The overhead allocation calculation formulae adopted by the council shall be established prior to budget balancing and shall be utilized by the executive to develop the executive proposed budget. The adopted formulae shall not be modified by the executive without council approval.

F. By May 31, 1993, and every year thereafter, the executive shall submit the proposed methodology for the overhead cost allocation plan to the council for review and approval. The proposed overhead cost allocation plan methodology shall adhere to the policies set forth in this chapter. (Ord. 10772 § 1, 1993).

KCC 4.04.045.

The districts contend that county employees should instead bill their actual time using a "time sheet" or other "time charges" method of billing. These claims were rejected after trial. We affirm.

The districts largely base their arguments on a pair of auditor reports that criticized the county's methodology for distributing overhead costs among the different departments. In 2005, the Washington State Auditor issued an "Accountability Audit Report" for King County. Trial Ex. 107. In "most areas," the auditor concluded that King County complied with the law. Trial Ex. 107, at 4 (Audit Report at 1). However, the auditor found that "[a]pproximately $2.9 million in general government costs charged to restricted funds were unauthorized or unsupported." *Id.*[27] During the audit period, the auditor found that "the County allocated approximately $1,997,000 in governmental costs to its water quality fund, which is financed by user fees . . . . [T]he County cannot demonstrate how these services benefit the water quality fund's operations. The county therefore cannot use these fees to pay for general government costs." Trial Ex. 107, at 14 (Audit Report at 11). It recommended the county "document and demonstrate that general government costs allocated to other funds are reflective of the fair and true value of services actually rendered to those funds." *Id.* The county agreed to reassess how it allocated general government costs. *Id.* A 2009 Ernst & Young audit commissioned by the

---

[27] The auditor also found that the solid waste fund paid about $5.8 million in retroactive rent to the general fund, that the county did not comply with state law when spending $878,888 in real estate excise tax, and did not follow state law when purchasing about $320,000 in biodiesel fuel. Trial Ex. 107, at 4 (Audit Report at 1).

43

State reached a similar conclusion and recommended the county adopt a different methodology for allocating overhead costs. Trial Ex. 187, at 24 (Ernst & Young audit at 13).

After trial, Judge Felnagle rejected these claims. He concluded that under the county code, "[b]est match . . . is broader than simply the most 'accurate' or 'equitable,' and may take into account cost-effectiveness as well as accuracy, fairness, and consistency." CP at 18687. He found the "allocation method is consistent with GAAP [(generally accepted accounting principles)] . . . [and t]here is nothing in the law or the facts of this case that requires the County to perform a retroactive 'true-up' of centralized costs." CP at 18688. After hearing the evidence, he also concluded that "[a] time sheet or time charges method could cost more than it would save." CP at 18685. The districts argue that using time sheets is better than the allocation method the county follows but provide no authority for the proposition that the county *must* use them.

The districts also argue that the overhead allocation violated their contracts with the county. Under those contracts, sewage disposal costs include

> "the cost of administration, operation, maintenance, repair and replacement of the Metropolitan Sewerage System, establishment and maintenance of necessary working capital and reserves, the requirements of any resolution providing for the issuance of revenue bonds of Metro to finance the acquisition, construction or use of sewerage facilities, *plus not to exceed 1% of the foregoing requirements for general administrative overhead costs.*"

CP at 18661 (quoting contracts) (emphasis added).

The districts contend that the contractual language, "plus not to exceed 1% of the foregoing requirements for general administrative overhead costs," imposes a 1% cap on overhead costs that can be included in the fees the county charges the sewage utilities for sewage treatment. King County argues that is not a cap, but instead, a permissible addition.

At the close of the districts' case in chief, Judge Felnagle granted King County's motion to dismiss this claim. 25 VRP (Feb. 28, 2011) at 1948. Judge Felnagle found, as a matter of law, that the 1% "is an addition to, not a limitation." *Id.*

While the contract provision could be clearer, Judge Felnagle's ruling is reasonable. The contract lists allowable costs ". . . *plus* not to exceed 1% of the foregoing requirements for general administrative overhead costs." CP at 18661 (emphasis added). It does not simply say "not to exceed." It instead authorizes the county to charge an additional 1% for general administrative maintenance costs.

The districts contend that the Water Quality Fund is entitled to reimbursement for prior overcharges. They contend that "King County agreed that overhead charges should be 'trued up.'" Br. of Appellants at 29 & n.94 (citing 22 VRP (Feb. 23, 2011) at 1520-21) (testimony of county's former budget director, Report Cowan). That is a questionable interpretation of the record. Cowan testified that "[p]hilosophically, yes, I agree that a true-up would probably be appropriate." 22 VRP (Feb. 23, 2011) at 1521. The districts also draw our attention to evidence that the county made an error

and overcharged the Wastewater Treatment Division $200,000 for general governmental overhead in 2003, which they contend requires reimbursement. The districts argue the trial judge overlooked this claim. This is also questionable. Judge Felnagle concluded that "[t]here is nothing in the law or the facts of this case that requires the County to perform a retroactive 'true-up' of centralized costs allocated to [Wastewater Treatment Division] . . . . Plaintiffs have not established any reasonable basis for requiring the County to perform a retroactive true-up." CP at 19688. That fairly encompasses the districts' claim.

Again, the districts provide no authority for the implicit premise that the county is required to recalculate former allocations. This claim was rejected after trial. We affirm.[28]

### 7. Credit Enhancement Fee

When King County backs a bond issued by a Wastewater Treatment Division, it charges a "credit enhancement fee." 22 VRP (Feb. 23, 2011) at 1530-31; CP at 18688-89. That fee is "one-half of the estimated difference in the financing costs that

---

[28] Former State Auditor Brian Sonntag urges this court to build on our recent holding in *City of Tacoma v. City of Bonney Lake*, 173 Wn.2d 584, 269 P.3d 1017 (2012), and hold that when the value of services provided by one government agency to another cannot be precisely valued, the court will defer to the parties' agreement. In the alternative, he asks that we hold that RCW 43.09.210 permits, but does not require, King County to charge the districts for allocated central services, credit enhancement fees, or other items the county provides. The counties argue that this is contrary to the language of the statute, which states that "[a]ll service rendered by[] . . . . one department . . . to another, shall be paid for at its true and full value." As neither argument is presented by the parties, we decline to reach them.

[the Wastewater Treatment Division] would incur were the County to issue revenue bonds rather than [limited tax general obligation] bonds . . . *i.e.*, one half of the 'spread.'" CP at 18689. That spread has varied over the years, but between 2003 and 2010, the total fees have amounted to $4.6 million. *Id.* The trial judge found that even with the fee, the Wastewater Treatment Division fund "still receives about half of the benefit of the lower interest rates attributable to the use of [limited tax general obligation] bonds rather than revenue bonds of like size and maturity," and that without it, the division "would pay substantially more in financing costs." CP at 18690. Backed bonds also avoid "the need to establish a debt service reserve fund." *Id.* Backing the bonds comes with costs for the county. "[R]ating agencies consider the total amount of debt that the County has outstanding in determining its credit rating"; its ability to issue additional similar bonds is reduced; and it assumes the risk of a fund default. CP at 18691. After trial, Judge Felnagle found the fee was lawful and not excessive.

Among other things, the trial court found that the fee was authorized by the state accountancy act, which provides in part:

> "All service rendered by, or property transferred from, one department[] . . . to another, shall be paid for at its true and full value by the department[] . . . receiving the same, and no department . . . shall benefit in any financial manner whatever by an appropriation or fund made for the support of another."

CP at 19692 (quoting RCW 43.09.210). Judge Felnagle found that the "principles underlying the Accountancy Act apply with particular force here, where the County's

taxpayers have conferred benefits and services on [the Wastewater Treatment Division] and its ratepayers." *Id.* The districts offer no meaningful rebuttal to this; they simply disagree that the ratepayers receive a benefit.[29] But plainly, they did. We affirm.

### 8. Credit Enhancement Fee

The districts assert that the credit enhancement fee is a hidden tax. Judge Felnagle rejected this claim after trial. The test for whether a fee is in fact a tax is well established:

> First, whether the primary purpose of the city is to raise revenue for general governmental purposes, or whether the primary purpose is to regulate. Second, whether the money collected must be allocated only to the authorized regulatory purpose. And, third, whether there is a direct relationship between the fee charged and the service received by those who pay the fee, or between the fee charged and the burden produced by the fee payer.

*Okeson*, 150 Wn.2d at 552-53 (citing *Covell v. City of Seattle*, 127 Wn.2d 874, 879-880, 905 P.2d 324 (1995)). Applying this test, we find the credit enhancement fee is a fee.

As we observed in *Okeson,* "[w]hat is important is the purpose behind the money raised—a tax raises revenue for the general public welfare, while a regulatory fee raises money to pay for or regulate the service that those who pay will enjoy (or to pay for or regulate the burden those who pay have created)." *Id.* (citing *Covell,* 127

---

[29] Former State Auditor Brian Sonntag urges us not to hold that the county was required under RCW 43.09.210 to charge a credit enhancement fee. He is concerned that this court might hold that the statute requires (as opposed to simply allows) this. The counties respond vehemently that the statute does so require. This case does not present a proper vehicle to explore the issue. Judge Felnagle found that the statute supported imposing the fee, not that the statute required it.

48

Wn.2d at 879). In this case, the credit enhancement fee is paid by the entity that enjoys the service. Because King County backs the bonds, the Wastewater Treatment Division enjoys better returns on its bonds. The first element weighs in favor of the credit enhancement fee being a fee. The second element arguably weighs in favor of the credit enhancement fee being a tax as it is paid into general funds. But the third element weighs heavily in favor of the credit enhancement fee being a fee. There is a direct relationship between the fee paid and the services the districts receive—the costs of the bonds are reduced.

We affirm. Given our disposition, we do not reach whether King County was entitled to raise affirmative defenses relevant to this claim that were dismissed by the trial judge at summary judgment.

CONCLUSION

We largely affirm, except as to the job retention payment to StockPot Soups as noted in section four, and we remand to the trial court for further proceedings consistent with this opinion.

González, J.

WE CONCUR:

Madsen, C.J.

Stephens, J.

Wiggins, J.

Fairhurst, J.

Hunt, J.P.T

50

*Cedar River, et al. v. King County, et al.*

No. 86293-1

GORDON McCLOUD, J. (concurring)—Two government entities—municipal water districts—here sue two other government entities—King and Snohomish Counties. The water districts allege violations of Title 82 RCW and the takings clause of the United States Constitution and rely on what the water districts call the "*Nollan/Dolan*"[1] line of cases in support of both claims.

I find no authority permitting one subdivision of the State to bring a "takings" claim against another subdivision of the State. And standing is generally treated as a threshold inquiry. *See Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 801-03, 83 P.3d 419 (2004).

The takings clause of the Fifth Amendment certainly protects individuals against uncompensated takings by the federal government. U.S. CONST. amend. V

---

[1] Br. of Appellants at 46 (arguing that the counties' actions were illegal under the "*Nollan/Dolan* test"). "*Nollan/Dolan*" refers to the seminal United States Supreme Court takings cases *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987) and *Dolan v. City of Tigard*, 512 U.S. 374, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994).

("nor shall private property be taken for public use, without just compensation."). It protects individuals against uncompensated takings by state governments. *See Dolan v. City of Tigard*, 512 U.S. 374, 383-84, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994) (noting that the takings clause is "made applicable to the States through the Fourteenth Amendment" (citing *Chi., B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 239, 17 S. Ct. 581, 41 L. Ed. 976 (1897))). It even protects states and their subdivisions against takings by the federal government. *United States v. 50 Acres of Land*, 469 U.S. 24, 31, 105 S. Ct. 451, 83 L. Ed. 2d 376 (1984). Interestingly, a recent Supreme Court ruling affirms that government water districts are among the government entities that the takings clause is designed to protect the rest of us from. *Koontz v. St. Johns River Water Mgmt. Dist.*, __ U.S. __, 133 S. Ct. 2586, 186 L. Ed. 2d 697 (2013). But I have found no authority holding that the takings clause or the *Nollan/Dolan* line of cases interpreting that clause protect such government water districts from takings by another subdivision of the state (here, King and Snohomish Counties). The water districts thus fail to establish standing to raise a Fifth Amendment takings claim.

Similarly, RCW 82.02.020 protects individuals against takings in the form of taxes and fees on development by subdivisions of the state. *Citizens for Rational Shoreline Planning v. Whatcom County*, 172 Wn.2d 384, 387, 258 P.3d

2

36 (2011). And, of course, the county defendants in this case are subdivisions of the state. But parties challenging government action under that statute must have standing. *Org. to Preserve Agric. Lands v. Adams County*, 128 Wn.2d 869, 894-95, 913 P.2d 793 (1996). And this court has previously held that such standing is limited to "developers." *Id.* at 895-96. Are the water district plaintiffs "developers?" The answer, in this case at least, is no; they are not the ones developing the Brightwater Treatment Plant, King County is. Thus, they do not seem to have standing as injured developers. That eliminates their standing to raise the Title 82 RCW claim.

The water districts acknowledge that they are neither parties to nor third party beneficiaries of the Snohomish-King County contracts. Reply Br. of Appellants/Cross-Resp'ts at 11. They therefore lack standing to raise challenges to those contracts, the main contracts at issue here.

Perhaps acknowledging this problem, the districts assert standing to raise their challenges, instead, under *Warburton*.[2] *Id.* at 10. But in *Warburton*, this court affirmed the *dismissal* of a city official's challenge to a school district's compromise of a claim with an outside architect. It was a 4-1-4 decision, in which the one concurring justice argued that the city official completely lacked standing

---

[2] *Warburton v. Tacoma Sch. Dist. No. 10*, 55 Wn.2d 746, 350 P.2d 161 (1960).

to raise the claim. *Warburton* therefore provides little support for the water

districts' arguments that they have standing to raise their challenge to the King-

Snohomish County agreement settling those parties' conflicting claims.[3, 4]

The water districts conclude that they have standing to raise claims under the

Uniform Declaratory Judgment Act (UDJA), chapter 7.24 RCW, and because of

the "violation of their rights under the sewage disposal contracts, the King County

Charter and Code, and other applicable statutes and legal principles." Reply Br. of

Appellants/Cross-Resp'ts at 11.

I have dealt with their standing to raise claims under the King-Snohomish

county contracts, Title 82 RCW, and the Fifth Amendment takings clause, above.

The UDJA does have prerequisites to using that procedure, but those prerequisites

refer back to whether there is an actual existing dispute based on whatever

---

[3] In *Warburton*, Stanton Warburton—acting individually and also in his official capacity as secretary of the county taxation bureau—sued a school district to enjoin payment in compromise of a dispute over the price of certain architectural services. The Superior Court dismissed the case, and the taxation bureau secretary appealed. Four justices of this court ruled that the school district's decision survived on the merits; four justices ruled that the school district's decision should be reversed on the merits; and one justice ruled that the secretary "has no capacity to maintain the action." *Warburton*, 55 Wn.2d at 754 (Mallery, J., concurring). That justice did not explain his reasoning. The judgment of dismissal was therefore affirmed; however, because there was no other ground upon which a majority agreed apart from the result, *Warburton* has no precedential value. *See In re Pers. Restraint of Francis*, 170 Wn.2d 517, 532 n.7, 242 P.3d 866 (2010).

[4] I note that no claim of representational standing has been made here. *Cf. Grant County Fire Prot. Dist.*, 150 Wn.2d at 801-04.

substantive claim a plaintiff asserts. If there is no substantive claim to be raised under any other theory, the UDJA will not save this lawsuit by some subdivisions of the State against actions taken by officials of other subdivisions of the State. The wisdom of discretionary actions by officials of different subdivisions of the state is usually something that the voters decide at the ballot box.[5]

The districts are correct, though, that they can raise "their rights under [their own] sewage disposal contracts." Reply Br. of Appellants/Cross-Resp'ts at 11. And they are correct that those contracts incorporate regulations placing limits on King County's mitigation payments that are similar to the limits in Title 82 RCW.

That is why this court can reach the water districts' claims. It is not because certain subdivisions of the State have standing to challenge alleged takings by other subdivisions of the State under RCW 82.02.020 or the takings clause, when those subdivisions are not even the developers.

---

[5] *Wash. State Leg. v. State*, 139 Wn.2d 129, 152, 985 P.2d 353 (1999) (Madsen, J., concurring) ("'many issues are better left to the more political branches of government to decide'" (quoting Philip A. Talmadge, *Understanding the Limits of Power: Judicial Restraint in General Jurisdiction Court Systems*, 22 SEATTLE U. L. REV. 695, 739 (1999))).

Gordon McCloud, J.

Hunt, J.P.T.